OPINION. Raum, Judge: 1. Petitioner employed the accrual method of accounting, and there is no dispute here that payments due from the State of Massachusetts on account of the so-called cost of service deficits would constitute taxable income in the year or years that they were properly accruable. Boston Elevated Railway Co., 45 B. T. A. 906, affd. (C. A. 1), 131 F. 2d 161, certiorari denied, 318 U. S. 760. The cost of service deficits herein for which petitioner sought reimbursement from the state were claimed to be $2,341,167.29 for the 12-month period ending March 31, 1941, and $1,311,406.44 for the 9-month period ending December 31, 1941. Respondent’s principal contention is that these amounts must be accrued in 1941. However, during 1941 and for some years thereafter, the state was challenging the legality of certain accounting procedures used in arriving at these amounts, and was therefore refusing to make any payments to petitioner. Accordingly, petitioner contends that these amounts were not properly accruable while thus in dispute. This issue turns, therefore, upon the application of the principles of accrual accounting to the facts of this case. These principles have long been understood and applied in a wide variety of cases. Thus, it has been held that liability for a tax accrues and is deductible from gross income, when “all the events” have occurred “which fix the amount of the tax and determine the liability of the taxpayer to pay it.” United States v. Anderson, 269 U. S. 422, 441. Moreover, an item may be accrued, “if there is legal liability, even though the amount is not definitely fixed, if all the events have occurred by which the amount may be determined with reasonable exactitude. Continental Tie & Lumber Co. v. United States, [286 U. S. 290].” Lehigh Valley Railroad Co., 12 T. C. 977, 995. But where the item, whether of income or deduction, depends upon a contingency or future events, it may not be accrued until the contingency or events have occurred and fixed with reasonable certainty the fact and amount of the liability involved. United States v. Safety Car Heating Co., 297 U. S. 88, 93-94; Lucas v. American Code Co., 280 U. S. 445, 451, 452. And where liability is substantially in controversy, accrual must await the resolution of the controversy. Security Mills Co. v. Commissioner, 321 U. S. 281, 284; Dixie Pine Co. v. Commissioner, 320 U. S. 516, 519; William Justin Petit, 8 T. C. 228; cf. North American Oil v. Burnet, 286 U. S. 417, 423-424. Respondent contends that “petitioner’s right to receive the deficit payments as defined in the Public Control Act as amended (certified by the Trustees to be the sums of $2,341,167.79 and $1,311,406.44) was fixed and definite at the end of its taxable year December 31, 1941”; that “at the end of December 1941 the Commonwealth was under a definite and fixed liability to pay whatever deficiency existed at that time”; that “the Commonwealth nowhere denied its liability to pay such amounts as deficiencies as were properly computed”; and that the amounts involved must therefore be accrued as of the end of 1941. Respondent further contends that, in any event, since the litigation contesting the payments was not instituted until 1942, it could not preclude the accrual of income as of the end of 1941 (cf. Edward J. Hudson, 11 T. C. 1042, 1050, affd. (C. A. 5), 183 F. 2d 180; Automobile Ins. Co. v. Commissioner (C. A. 2), 72 F. 2d 265, 267). We do not agree. Although the litigation had not yet been formally instituted in 1941, the controversy had ripened to the point where the state in 1941 was openly contesting its liability with respect to the amounts certified by the Trustees, and had taken significant steps to challenge the legality of the processes by which these amounts were computed. On March 12, 1941, the Finance Commission of the City of Boston made public its report in which it charged that in past years the Trustees had made excessive charges to cost of service of approximately $20,000,000, and that the methods and practices used by the Trustees in determining the amount of the deficits were improper and illegal. That report, which was made approximately one month prior to the notification given by the Trustees to the commonwealth of the March 31 cost-of-service deficit, apparently raised doubts in the mind of the Governor as to the validity and existence of this alleged deficit, and caused him to request an advisory opinion by the Justices of the Supreme Judicial Court of Massachusetts. Their opinion, dated May 28, 1941, declared that the liability of the commonwealth to pay the alleged March 31 “deficiency” was limited to an obligation to pay the amount thereof legally incurred; that the notification by the Trustees was not in the nature of an adjudication that the amounts stated by them constituted such an obligation; that in determining whether there was a liability upon the commonwealth for the amount of the “deficiency,” the Governor and the Council had the right to consider whether the elements entering into the computation of such “deficiency” were in accordance with law; and that reasonable doubt on the part of the Governor and the Council as to the existence or amount, according to law, of an obligation or liability could be found by them to be a sufficient reason for delay in issuing a warrant for payment. Thereafter, in June 1941, the attorney general of the commonwealth recommended that legal proceedings be instituted to ascertain whether the Trustees had improperly included in cost of service large amounts on account of items and charges not authorized by law to be included therein, and, upon recommendation of the Governor, an appropriation of $75,000 was made by the legislature for this purpose in October 1941. In the fall of 1941, the attorney general’s office started work on the preparation of such proceedings. In the latter part of that year, the petitioner made an unsuccessful attempt to induce the commonwealth to make either an outright or a qualified payment of the amount of the March 31 deficit. To be sure, suit was not actually filed until January 26, 1942. But the fact that a $75,000 appropriation had already been approved by the legislature in 1941 to finance the litigation made it virtually a foregone conclusion that suit would be filed. The controversy had reached a high?pitch as of December 31,1941. Surely, petitioner had no reasonable grounds for believing that it would be reimbursed for the deficits shown on its books, other than in the event of a successful termination of the pending dispute. The filing of the suit and other events in 1942 merely confirmed the existence of the controversy in 1941. It is misleading to suggest, as does respondent, that the commonwealth nowhere denied its liability to pay such amounts as deficiencies as were properly computed. Of course, the commonwealth did not deny such liability as the statute imposed upon it; but the heart of the controversy was the challenge to the legality of the underlying procedures that were employed to measure that liability. This was more than a mere difference as to computations. It was a substantial legal controversy of a high order of magnitude; and until it was resolved, petitioner could not be required to accrue as income any payments which depended upon the outcome of that controversy. Respondent presses upon us a number of decisions growing out of the Federal control of railroads around the time of World War I.[4] In particular, he places special reliance upon Continental Tie & Lumber Co. v. United States, 286 U. S. 290. In the Continental Tie & Lumber Co. case a payment was received by a taxpayer in 1923 pursuant to an award in that year by the Interstate Commerce Commission under section 204 of the Transportation Act of 1920. That section provided for such an award to a railroad which during any part of the period of Federal control competed for traffic, or connected, with one under Federal control, and sustained a deficit in operating income for that portion of the period during which it operated its own railroad. The Act directed the Commission to compare the results of such operation with those of the test period (the 3 years ended June 30, 1917); and, if less favorable during the period of Federal control than during the test period, to award an amount calculated as prescribed by the section. The Supreme Court held that the award to the taxpayer had accrued in 1920, when the Act providing for the award was enacted, and was taxable income in that year rather than in 1923, the year in which the award was made. The underlying basis for this holding was that the right to the award was fixed by the passage of the Transportation Act in 1920; that all that remained was mere ascertainment of the amount to be paid; and that the taxpayer had in its own books and accounts in 1920 data to which it could apply the calculations required by the statute and ascertain the quantum of the award within reasonable limits. It is true that there is a certain superficial similarity between the present case and the Continental Tie & Lumber Co. case. As the Court pointed out (pp. 296-297), the 1920 Act merely formulated general principles for the computation of 'the award, leaving a number of problems, many of them difficult, to be worked out by the Interstate Commerce Commission, and indeed the applicable principles dealing with those problems were not settled by the Commission until 1921,1922, and 1923. Nevertheless, the Court declared that (pp. 297-298) “in spite of these inherent difficulties we think it was possible for a carrier to ascertain with reasonable accuracy the amount of the award.to be paid by the Government. * * * It does not appear that a proper effort would not have obtained a result approximately in accord with what the Commission ultimately found.”[5] Regardless of the conclusion thus reached upon the record in that case, it is our view that upon the record now before us the petitioner herein could not in 1941 make any reasonably accurate forecast of the ultimate outcome of the pending controversy and that it could not at that time make any reasonable estimate as to how much, if anything, it would ever receive upon its claims for reimbursement with respect to its alleged deficits. In these circumstances, petitioner was not required to accrue the amounts in question in 1941. Respondent has made certain alternative contentions that the amount of the deficit for the 9-month period ending December 31, 1941, should be accrued in 1942, or that, in any event, both deficits should be accrued in 1943. However, the controversy was no closer to a solution in 1942 and 1943 than it was in 1941, and, for the reasons stated above, these alternative contentions must similarly be rejected. 2. Petitioner claims a deduction from its 1942 gross income for a loss with respect to the Atlantic Avenue section of its elevated railway structure. By amendment to its petition, the petitioner makes the alternative claim that the loss was sustained in 1941. Respondent, on the other hand, contends that the loss was sustained in 1938 by reason of abandonment in that year. Section 23 (f) of the Internal Revenue Code permits a corporation to deduct losses sustained during the taxable year and not compensated by insurance or otherwise. The Commissioner’s regulations provide that the difference between the adjusted basis and the salvage value of a capital asset may be deducted as a loss under section 23 (f) when the usefulness of the asset in the taxpayer’s business is suddenly terminated and it discards the asset permanently from use in its business. Section 19.23 (e)-3, Regulations 103; section 29.23 (e)-3, Regulations 111. In order to have an abandonment it is necessary that there be an intention of the owner to abandon the property, coupled with an act of abandonment, both of which must be ascertained from all of the surrounding facts and circumstances. Belridge Oil Co., 11 B. T. A. 127, 137; Reuben H. Donnelley Corp., 26 B. T. A. 107, 115; Ewald Iron Co., 37 B. T. A. 798, 799; W. B. Davis & Son, Inc., 5 T. C. 1195, 1219. Non-use, alone, is not enough. W. B. Davis & Son, Inc., supra; I. G. Zumwalt, 25 B. T. A. 566, 574; Ewald Iron Co., supra. The respondent contends that the petitioner did not sustain any loss in 1941 or 1942, and that the loss, if any, was sustained prior to 1941. He urges that the evidence indicates that the Trustees became dissatisfied with the Atlantic Avenue line prior to 1938 and intended to abandon its use and substitute bus service; that they carried out this intention in 1938 “knowing well that it would result in a forfeiture of the location”; and that the intent to discontinue service when combined with the knowledge that such action constituted grounds for the declaration of a forfeiture of the location on Atlantic Avenue is sufficient to establish an intent on the part of the Trustees to abandon the Atlantic Avenue line. He also urges that intention to abandon in 1938 is indicated by acts with reference to the structure subsequent to that year, such as, the reduction in expenditures for track walking from $63.50 a week to $3.46 a week, the placing of some of the cable on the structure in an underground conduit, the removal of passim-eters, fare boxes, etc., from stations on the structure, and the substitution in 1941 of plain rail for certain frogs and switch points where the structure joined the main line at Tower D. That the Trustees became dissatisfied with the Atlantic Avenue line prior to 1938 is undoubtedly true. The principal causes of this dissatisfaction were the decline in revenue from that line after the opening of the Washington Street Tunnel, the interference of Atlantic Avenue trains with main line trains on the elevated structure where they separated to travel their respective routes, and the potential saving in cost of service, estimated in 1937 to be approximately $81*000 per year, which they felt would result from the substitution of bus and other service for the train service on the Atlantic Avenue line. It is not surprising, therefore, that the Trustees let it be known in 1924 and in 1937, that from an operating standpoint they would not object to the sale of the Atlantic Avenue structure for an elevated roadway, provided the sale was for cash and for a sum which would substantially aid in the financing of the road. They realized, however, that they had no authority to effect a sale or otherwise dispose of the structure without the consent of the board of directors. Before taking action to discontinue service in 1938, they sought the consent of petitioner’s board of directors, and although they failed to get it, their letter to the board dated October 17, 1938, indicates that their decision to discontinue service as of October 1,1938, was made in the light of the opinion of counsel for the board that, while consent of the board to such discontinuance would result in forfeiture of the structure, an independent decision by the Trustees themselves to discontinue service would not. In these circumstances, we think that the respondent is not justified in saying that when the Trustees decided to discontinue service on tlie Atlantic Avenue structure they knew that such action constituted grounds for forfeiture. In a letter dated November 4, 1937, to the Special Commission appointed by the State legislature to investigate the removal of the Atlantic Avenue structure, the Trustees said: “It is a fact that the Alantic Avenue Elevated forms a connecting link between the south and north sides of the city, and in an emergency might be useful to maintain through service without interruption.” This thought also appears in the statement of the president and general manager to the Trustees at the time of discontinuance of service in 1938, that he planned to keep the Atlantic Avenue line ready for use at all times, in case the need arose, and in his memorandum to the Superintendent of Power dated November 23, 1938, that he approved cutting off the power from the third rail on the Atlantic Avenue structure, “on the understanding that it can be made alive, if necessary, upon reasonable notice.” Moreover, he instructed the various departments of the company that the structure should be kept so that if it were needed for any reason, it could “be opened reasonably quickly,” and he testified that to the best of his knowledge it was kept in a condition so that service could have been resumed on reasonably prompt notice. The superintendent in charge of the operation of the rapid transit lines testified that his understanding at the time service was discontinued was that the Atlantic Avenue structure was to be inspected frequently so that it would be ready for use within, possibly, an hour’s time, and that the only thing done between October 1938, and January 1942, that would have delayed resumption of operations for a longer period was the removal of frogs and switches at Tower D and the substitution of plain rail in 1941. The reinstallation of these frogs and switches, which were kept on location, would, according to the witness, have taken about three or four hours. The president and general manager testified that he considered the Atlantic Avenue structure to be a valuable facility not only for use in case of interruption for any cause of service through the Washington Street Tunnel, but also in case anything transpired that shifted the traffic load to such an extent that they might want to use it again. A director of the company since 1930 testified that it had considerable value during the period from October 1,1938, to the time of its demolition in 1942, as an alternative route, in the event the tunnel became overcrowded or there was any breakdown in the service, and because it was the only connection owned by petitioner between the northerly and the southerly portions of its main line elevated railway. He also testified that it had a potential value in case of a sale for use as an elevated highway, or in the event of possible acquisition by the state or other public authority of the properties of petitioner by eminent domain. Further evidence that the petitioner did not intend to abandon the Atlantic Avenue structure and that it considered it to have a value in excess of what might be realized upon demolition, is the action it took to protect its rights to the structure and location, after the Massachusetts legislature in 1939 enacted a statute purporting to declare the right of the petitioner to maintain and operate the Atlantic Avenue structure had been forfeited and to require its removal. Petitioner immediately filed a petition in equity in the Supreme Judicial Court of Massachusetts to determine whether there was just cause for the declaration of forfeiture, pursuant to a provision in the statute permitting it to do so. Petitioner expended $7,500 for legal services in the preparation and prosecution of this case. It was not until 1942 that the court rendered its opinion holding that the petitioner had forfeited its right to maintain the Atlantic Avenue structure by reason of its breach of the implied condition upon which the location and the right to maintain and operate an elevated structure had been granted, L e., that it be used to “equip, maintain and operate engines, meters and cars thereon.” Boston Elevated Railway v. Commonwealth, 310 Mass. 528, 39 N. E. 2d 87, 116.[6] Petitioner has proved to our satisfaction that there was no abandonment of or intention to abandon the Atlantic Avenue structure at the time operation of trains was discontinued in 1938, or at any other time' prior to the decision of the Massachusetts Supreme Judicial Court in 1942, and we have made a finding to this effect. The parties have stipulated that in such circumstances, the amount of the loss sustained in 1942 is $3,570,047.07, less the amount of depreciation allowable with respect to the Atlantic Avenue line for the intervening period from the end of 1938 to and including 1942. The respondent contends, however, that even if petitioner sustained a loss at the time of the removal of the Atlantic Avenue structure in 1942, it is not deductible under the provisions of section 23 (f), as a loss sustained during the taxable year “and not compensated for by insurance or otherwise.” The respondent argues that under the provisions of the Public Control Act of 1918, as amended, the petitioner had a right to charge the Atlantic Avenue loss to cost of service, and thus to recover the amount of the loss from the commonwealth by way of deficit payment. We disagree. Passing the question whether the amount of this loss could be in-eluded in the cost of service in 1942 under tlie Massachusetts legislation, we think that respondent’s position misconceives the nature of payments under the Public Control Act. The statute did not undertake to compensate petitioner for any particular loss; rather, it undertook to assure petitioner a given level of income, after providing for various charges (including losses) representing the cost of operation, that would enable petitioner to pay dividends at a specified rate. Thus, regardless of the amounts of any possible losses sustained by petitioner, no payments would be forthcoming to it if its income were sufficiently high, after absorbing the losses and other charges, to pay the required dividends. And to the extent that the commonwealth was obligated to make payments to petitioner, such payments constituted taxable income to petitioner. Boston Elevated Railway Co., 45 B. T. A. 906, affd. (C. A. 1), 131 F. 2d 161. certiorari denied, 318 U. S. 760. They were not in the nature of payments restoring a loss of capital that would normally be received tax-free (apart from excess over basis). We think that the arrangement between petitioner and the commonwealth does not require the disallowance of the loss under section 23 (f). We conclude that petitioner’s loss with respect to its Atlantic Avenue line is deductible in 1942. In the circumstances, it is entitled to depreciation deductions with respect thereto for the period prior to the loss. Cf. Carter-Colton Cigar Co., 9 T. C. 219, 221. The parties have stipulated the amounts which constitute a reasonable allowance for depreciation for the years included in that period, and deductions will be allowed herein for the years in controversy. 3. The final issue relates to the right of the petitioner to a deduction in the amount of $50,530.47 in each of the years 1940,1941,1942, and 1943. These deductions, claimed by the petitioner, were allowed by the respondent in his notice of deficiency, but in his amended answer he alleges that no part thereof is properly deductible from petitioner’s income for the taxable years. Since this issue was raised by respondent for the first time in his amended answer, the burden is upon him to prove that his allowance of the deductions was erroneous. His argument in support of disal-lowance is that there is nothing to show that the payment of $1,409,-253.35 was the consideration for a 28-year extension of the period of public control, as petitioner urges, and that the evidence indicates that this payment was only one of the many conditions which petitioner had to meet to accept the provisions of chapter 333 of the Special Acts of 1931. Section 11 of the Public Control Act provided that whenever during the period of public operation the petitioner’s reserve fund exceeded the amount originally established, the Trustees should apply the excess to reimburse the commonwealth for the amount of any “deficiency” •which it had paid the company. At the time of the enactment of chapter 383 of the Massachusetts Acts of 1931, the commonwealth had received reimbursement of the amount of any deficiency theretofore paid by it to the company, with the exception of $1,409,253.35. The 1931 act was accepted by the stockholders of the petitioner on June 30,1931, and section 22 was accepted by its board of directors on May 21,1931. By such acceptance the company agreed to an extension of public management and operation of its properties to July 1, 1959 (sec. 1); to a reduction in dividends payable upon its common stock from 6 to 5 per cent (sec. 2); to certain changes in the procedure to be followed upon occurrence of a deficit (sec. 3); to the extension to July 1, 1962, of the term of all subway and tunnel leases (sec. 3A); to the issuance of its bonds in an amount not exceeding $30,000,000 for the purpose of retiring its preferred stocks, and for the purchase of such bonds' by the Metropolitan Transit District (secs. 4, 5) ; to pay annually to the District, in addition to interest on its bonds, a sum sufficient when added to said interest to enable the District to net, after paying interest on its own bonds, an amount equal to 2 per cent per annum on the Company’s bonds held by it (sec. 6) to declare and pay dividends not in excess of 6 per cent per annum on its common stock after termination of public management and operation (sec. 17); to give the commonwealth or any political subdivision thereof or any corporation specifically authorized by the commonwealth to purchase the same, the right to purchase, at any time during the period of public management and operation, its assets and franchises as a going concern (sec. 17); to the taking of its property and franchises at any time through the exercise of the power of eminent domain (sec. 17); to be subject to and bound by such regulations as to fares and services as the General Court or the Department of Public Utilities might prescribe after the termination of public management and control (sec. 17); and to the suspension of the payment of deficits for the year ending June 30,1931 (sec. 22). In addition to the foregoing, the 1931 act provided in section 23, as follows: When all the second preferred stock of the company has been retired, the special trust fund established under the provisions of section nine of chapter seven hundred and forty of the acts of nineteen hundred and eleven shall, to the extent necessary therefor, be converted by the trustees of the company into cash and the same shall thereupon be applied to repay to the commonwealth all amounts which, prior to the effective date of this act, have been assessed under the provisions of chapter one hundred and fifty-nine of the Special Acts of nineteen hundred and eighteen upon the cities and towns served by the company and which have not been previously repaid to the commonwealth, and the treasurer and receiver general of the commonwealth shall thereupon distribute the same to such cities and towns as provided in said chapter. Any balance remaining in said fund shall be applied as provided in said chapter seven hundred and forty. The $1,409,253.35 payment here involved was made pursuant to the provisions of section 23 on August 19,1931. It is apparent from the foregoing that the petitioner indeed was required to consent to a number of conditions in addition to the payment provided for in section 23. The fact remains, however, that it did pay $1,409,253.35 in conjunction with other consideration flowing from it in order to obtain the 28-year extension of the period of public control with its attendant benefits to it, including a guaranteed income. And if the consideration for obtaining such a long term arrangement is amortizable over the period involved, it is apparent that the $1,409,253.35 payment must be so spread, even though it represented only part of the consideration. That an expenditure made in acquiring a capital asset or a contract which is expected to be income producing over a series of years is in the nature of a capital expenditure which must be amortized ratably over the life of the asset or the period of the contract is well established. Bonwit Teller & Co., 17 B. T. A. 1019, 1024, affirmed on this point (C. A. 2), 53 F. 2d 381, certiorari denied, 284 U. S. 690; Central Bank Bloch Assn. v. Commissioner (C. A. 5), 57 F. 2d 5; Young v. Commissioner (C. A. 9), 59 F. 2d 691, certiorari denied, 287 U. S. 652; Home Trust Co. v. Commissioner (C. A. 8), 65 F. 2d 532; Main & McKinney Bldg. Co. v. Commissioner (C. A. 5), 113 F. 2d 81, certiorari denied, 311 U. S. 688; Blanche B. Burley, 26 B. T. A. 615; cf. Commissioner v. Boylston Market Assn. (C. A. 1), 131 F. 2d 966. The rule of these decisions requires that this issue be decided in favor of the petitioner. Decision toill l>e entered under Rule 50. Illinois Terminal Co., 5 B. T. A. 15; Great Northern Railway Co., 8 B. T. A. 225, affd. (C. A. 8), 40 F. 2d 372; Texas & Pacific Railway Co., 9 B. T. A. 365; Commissioner v. Old Dominion S. S. Co. (C. A. 2), 47 F. 2d 148; Commissioner v. Midland Val. R. Co., (C. A. 10), 57 F. 2d 1042; Helvering v. St. Louis Southwestern Ry. Co. (C, A. 8), 66 F. 2d 633, certiorari denied, 292 U. S. 626. The opinion of the Court of Claims, 52 P. 2d 1045, 1049, which was affirmed by the Supreme Court, contains the following statement: The plaintiff had previous knowledge and experience as to the test period whereby the railway operating income and deficit were to be measured and the transportation act was enacted in ample time for the necessary computations to have been made or reasonably estimated for the purpose of accrual in 1920. No contention is made as to any question of dispute or difference between the parties which might have made an estimate or accrual of the claim of the Cimarron & Northwestern Railway Company impossible. There appears to have been no substantial dispute between the plaintiff and the Interstate Commerce Commission as to its claim. * * * The court said (310 Mass, at p. 571, 39 N. E. 2d at pp. 116-117) : Tie question involved is to be distinguished from the question of abandonment of an easement or other interest in land, where intention to abandon is an important factor. * * * In such cases it has been said that abandonment is not to be inferred from mere nonuser. Here, however, the question arises between the Commonwealth, the grantor of this location, and the company, the grantee, and is whether the grantee has failed to perform a condition of the grant. Whether or not the grantee intended to abandon the location is not decisive if. in fact, such grantee has not performed the condition.