KANNE v. AMERICAN FACTORS, Limited.
AMERICAN FACTORS, Limited, v. KANNE.
No. 12391.

United States Court of Appeals
Ninth Circuit.
June 13, 1951.

156

Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Leland T. Atherton, Sp. Assts. to Atty. Gen., for Kanne.

Urban E. Wild, Milton Cades, Honolulu, T. H. (Smith, Wild, Beebe & Cades, Honolulu, T. H., of counsel), for American Factors, Ltd.

Before DENMAN, Chief Judge, and ORR and POPE, Circuit Judges.

DENMAN, Chief Judge.

The taxpayer, American Factors, Limited, appeals from a judgment of the United States District Court, District of Hawaii, rendered upon a complaint for a refund of taxes claimed to be overpaid for the tax year 1932. The complaint alleges that the Commissioner of Internal Revenue had erred in disallowing a deduction made in the taxpayer's return for that year of $568,607.76, as an ordinary and necessary business expense. This sum had been paid by it in that and prior years in the defense of litigation, hereafter called the "Hackfeld litigation," brought against it and 23 of its shareholders, hereafter called the group of 23. The complaint further alleges the Commissioner also erred in disallowing a deduction for a promissory note for $50,000 which it claims became valueless in 1932. The district court allowed a deduction of but $171,795.26 for the Hackfeld litigation expenses as ordinary and necessary and disallowed $396,812.50 thereof. It also upheld the Commissioner in his denial of the deduction for the $50,000 note.

Mrs. Kanne, the widow of a deceased Collector of Internal Revenue, hereafter called Collector, appeals from the judgment in so far as it awards a refund of taxes for 1932, claiming error in allowing the deduction of $171,795.26 as a business expense.

H. Hackfeld & Company, Limited, hereafter called Hackfeld, was a Hawaiian corporation which in 1918, during the war with Germany, had 68½% of its shares controlled by alien German enemies. In March 1918 the Alien Property Custodian, hereafter called the Custodian, seized these German controlled shares and thereby obtained the control of that company. He was confronted with the question whether he should continue the operation of that company for the benefit of the government's 68½% of the shares and the remaining 31½% held by loyal shareholders.

The German name Hackfeld was a liability and its business was a highly complicated and competitive one, not suited to governmental operation. In 1917 it was one of the largest and most important of the five sugar factor companies in Hawaii. In addition, it conducted a very large merchandising business and held various agencies of steamship lines and insurance companies. It was the agent of nine large and important sugar plantations in the islands, to which it rendered various services. It made money advances, sold the principal's sugar on commission, furnished supplies under its agency contracts, on which commissions were charged, and acted as banker and adviser to the plantations which it served.

Rejecting other proposals, the Custodian decided to continue the business as a whole in another Hawaiian corporation and in 1918 organized the taxpayer under the Hawaiian law.

The Custodian caused all of the 50,000 shares of the taxpayer to be issued to a group of trustees to hold the shares during the period of the war and for three years thereafter. He caused the trustees to issue certificates of interest in the shares to be sold to two groups. One of these was a group of 23 prominent citizens and corporations of Hawaii, engaged in the sugar industry and allied interests. To these were to be sold the certificates of interest for 25,000 shares for the purpose of affording continuity of control of the corporation, thus giving the public confidence in the successful continuance of the business and thereby persuade investors to buy the remaining 25,000 certificates of interest in the shares. Subscriptions were obtained from 614 persons for the second 25,000 shares. All the certificates were sold for $7,500,000, which money was paid to the Hackfeld corporation as consideration for the transfer of its properties and business as a going concern. Thereafter the Hackfeld corporation was dissolved.

The taxpayer prosperously continued its business through the remainder of the war and until three years thereafter, when the holders of the certificates, on or about July 2, 1924, became the actual shareholders in the corporation.

### The Hackfeld Litigation.

About June, 1924, the directors of the taxpayer were informed that former stockholders of Hackfeld threatened to initiate litigation against it. At that time it was not known what form the litigation would take nor who would be defendants. The board of directors of the taxpayer, after consideration, authorized its president, Mr. Bottomley, to secure counsel to prepare for and conduct the defense in the threatened litigation, and the services of prominent attorneys were engaged for that purpose.

Prior to filing of the suits in the threatened Hackfeld litigation, hereinafter more fully described, it was rumored that the 23 persons and corporations who had joined in the joint subscription agreement for shares of stock of American Factors were to be charged with fraud and conspiracy in connection with their participation in various capacities and various ways in the reorganization of Hackfeld into the taxpayer.

Two identical suits were begun, one in Hawaii and one in the Superior Court of the City and County of San Francisco, State of California. The latter was tried. It was brought by J. C. Isenberg et al., plaintiffs, v. George Sherman—American Factors et al., defendants. As seen, the taxpayer was one of the defendants and the group of 23 corporations and persons, who by this time had become shareholders in the taxpayer, were joined as defendants. The Alien Property Custodian was made a defendant but no relief or judgment was sought against him. Certain other persons were made formal defendants, it being alleged that they should have joined as plaintiffs.

The Isenberg suit was brought in equity and properly described in its title "Complaint for Accounting Relief Against Fraud and Conspiracy, for Damages and Incidental Relief." The complaint affirmed the sale, disavowing its rescission, and sought solely a judgment for damages against the taxpayer and the group of 23.[1]

It alleged the sale was accomplished by conspiracy, collusion and fraudulent connivance among the group of 23 and the taxpayer whereby the taxpayer, with full knowledge of the facts, secured the assets of the profitable business of Hackfeld, and that the price of $7,500,000 was far below its known true value. The object of the suit was to require taxpayer and the group of 23 to account to the plaintiffs for the difference between the $7,500,000 and the actual value at the date of the transfer, claimed to be $17,500,000.

It further alleged that the taxpayer, so in the control of the 23 shareholders, after acquiring the Hackfeld assets and business, thereafter so mismanaged them as to cause great damage to them and, since the taxpayer held its property so wrongfully taken from plaintiff in trust to protect their rights and equities in the properties, by such mismanagement taxpayer had damaged the plaintiffs an additional $2,500,000.

Inter alia, the complaint sought the creation of a trust of all the taxpayer's properties, to be held for execution of the judgment. It is apparent that if the group of 23, so chosen by the Custodian, had been guilty of the charged misrepresentation, all the taxpayer's properties would have been subject to a $12,500,000 execution on a judgment for that amount, and its vast and successful business destroyed.

The attorneys employed by the taxpayer investigated the facts and matters pertaining to the Hackfeld litigation and prepared a joint answer on behalf of American Factors and the other defendants (except the Alien Property Custodian and the nominal defendants) and signed and filed the answer on behalf of such Hackfeld defendants. A separate answer was filed on behalf of the Alien Property Custodian.

The litigation continued in the California trial court until into January, 1926, when the trial judge decided: "I am of the opinion (1) no actual fraud on the part of respondents was shown; (2) no constructive fraud existed; (3) the price

---

1. In no sense can the litigation costs be deemed a capital expenditure, and the Collector does not so contend. Hochs-  child v. Commissioner of Internal Revenue, 2 Cir., 161 F.2d 817.

paid was adequate; (4) the suit is not barred by the Hawaiian statute of limitations; (5) plaintiffs were not guilty of laches."

The trial judge's decision became final. The judgment was appealed to the California Supreme Court and there affirmed. Isenberg v. Sherman, 212 Cal. 454, 298 P. 1004. Certiorari to the United States Supreme Court was sought and the litigation ended by its denial on April 25, 1932. 286 U.S. 547, 52 S.Ct. 501, 76 L.Ed. 1283.

*The litigation costs of the Hackfeld suit are an ordinary and necessary business expense.*

■ The Collector contends that none of the nine years' Hackfeld litigation expenses are deductible because they are not ordinary and necessary business expenses within § 23 of the Revenue Act of 1932, c. 209, 47 Stat. 169, 26 U.S.C.A.Int.Rev.Acts, page 489, providing:

"§ 23. Deductions from Gross Income

"In computing net income there shall be allowed as deductions:

"(a) Expenses. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *."

It is not extraordinary for great corporate enterprises like the taxpayer to find themselves, in the course of their business, subjected to just such attacks on the ground of their alleged fraud and of those controlling it. As was said in Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 471, 64 S.Ct. 249, 252, 88 L.Ed. 171, in holding as "ordinary and necessary" the expenses of *unsuccessfully* litigating a suit to set aside a fraud order of the Post Office Department: "It is plain that respondent's legal expenses were both 'ordinary and necessary' if those words be given their commonly accepted meaning. For respondent to employ a lawyer to defend his business from threatened destruction was 'normal'; it was the response ordinarily to be expected. Cf. Deputy v. Du Pont, 308 U.S. 488, 495, 60 S.Ct. 363, 467, 84 L.Ed. 416; Welch v. Helvering, 290 U.S. 111, 114, 54 S.Ct. 8, 9, 78 L.Ed. 212; Kornhauser v. United

States, supra [276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505]. Since the record contains no suggestion that the defense was in bad faith or that the attorney's fees were unreasonable, the expenses incurred in defending the business can also be assumed appropriate and helpful, and therefore 'necessary.' Cf. Welch v. Helvering, supra, 290 U.S. at page 113, 54 S.Ct. at page 8, 78 L.Ed. 212; Kornhauser v. United States, supra, 276 U.S. at page 152, 48 S.Ct. at page 220, * * *."

This case reaffirms the principle stated in Welch v. Helvering, 290 U.S. 111, 113–114, 54 S.Ct. 8, 9: "We may assume that the payments to creditors of the Welch Company were necessary for the development of the petitioner's business, at least in the sense that they were appropriate and helpful. McCulloch v. [State of] Maryland, 4 Wheat. 316, 4 L.Ed. 579. *He certainly thought they were, and we should be slow to override his judgment.* But the problem is not solved when the payments are characterized as necessary. Many necessary payments are charges upon capital. There is need to determine whether they are both necessary and ordinary. Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. Cf. Kornhauser v. United States, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505. The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part." (Emphasis supplied.)

There is no merit in the suggestion that the costs of defending a suit which would destroy its business in 1924 are any the less

an ordinary and necessary expenditure because the suit is based on completely disproved charges of wrongdoing in the taxpayer's first business of purchasing assets with the money obtained from the sale of its stock. Taxpayer is an Hawaiian corporation and the cases in that jurisdiction show that fraud in the acquisition of assets is not an extraordinary occurrence. Hitchcock v. Hustace, 14 Haw. 232.

If the time the wrongdoing is falsely alleged to have occurred determines whether the defense of the suit is ordinary and necessary, then as well it could be said that if at the time of the acquisition of a great sugar plantation an enemy had planted in it destructive insects or viruses inimical to sugar cane, the moneys spent six years later in attempting to eradicate the ravages of such action by taxpayer's enemy would be disallowed as an ordinary and necessary business expense.[2]

Since these nine years' litigation expenses are ordinary and necessary, the questions arising are to whom and to what extent the expenses are attributable and the tax years in which they are deductible.

*The District Court's Allowance of the $171,795.26 Deduction.*

■ The amount of $83,802.76 out of the total $171,795.26 was paid prior to the year 1932; the balance, $87,992.50, was paid in 1932, the year the litigation ended. The district court allowed the deduction of the entire amount in the tax year 1932.

We are unable to see a sound basis for allowing the $83,802.76 deduction in 1932. Not only was the taxpayer on the accrual basis but, as noted, this amount was actually paid prior to 1932. The taxpayer seeks to sustain this part of the deduction on the basis of Dixie Pine Products Company v. Commissioner of Internal Revenue, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270, where it was held that if a liability is contingent and is contested by the taxpayer, the liability cannot be deducted until after a final adverse adjudication. Taxpayer contends that it was impossible to determine, until the litigation was finally determined in 1932, whether it or its co-defendants must bear this expense. This contention is rested on the theory that if the plaintiffs in the Hackfeld suit prevailed, taxpayer's co-defendants would, as a matter of law, be required to pay all the litigation costs. Assuming this to be so, we do not think the Dixie Pine case sustains the deduction. In that case not only had the state tax for which deduction was claimed not been paid, but the taxpayer had a suit pending in which it asserted that it did not owe the tax. In the instant case, liability of the taxpayer to the *attorneys* for their fees and for other litigation expense was not unsettled, contingent or denied and, in fact, had been paid. The mere possibility that at some indefinite future time the taxpayer might have a remedy over against third parties for these expenses actually paid does not warrant postponing the taking of the deduction.

The district court is ordered to amend its judgment in so far as it allowed a deduction for the $83,802.76 and to determine the claim for a refund without allowing the deduction of this amount.

■ The balance of the $171,795.26, that is, $87,992.50, was paid to the attorneys by the taxpayer in 1932 in payment of fees for defending both the taxpayer and the group of 23.

There is no merit in the Collector's contention that, though the evidence shows that the attorneys' fees were paid in 1932 as final litigation fees after the denial of certiorari by the Supreme Court in that year, the taxpayer, on an accrual basis, should have determined the amount of services rendered by the attorneys before 1932

---

2. If this be in disagreement with dicta of the Tenth Circuit in the case of Hales-Mullaly, Inc., v. Commissioner of Internal Revenue, 131 F.2d 509, 512, the reasoning of that court is without merit. That case is distinguishable upon the ground that instead of there being a judgment, as here, exonerating those charged with the wrongdoing, the litigation was settled. It is further distinguishable on the ground that if, as there held, there be no ordinary likelihood of such litigation in the furniture business, for the instant taxpayer's business here such litigation is not extraordinary.

and taken a deduction in the prior years in which the services were rendered. This would require a businessman making up his tax return for a preceding year to ask attorneys conducting a partially litigated case to calculate the amount of their charges for that tax year. Business is not conducted in such a manner, nor can attorneys reasonably be required to make such calculations. Cf. Canton Cotton Mills v. United States, Ct.Cl., 94 F.Supp. 561; Crown Cork & Seal Co. v. United States, D.C.E.D.N.Y., 4 F.Supp. 525, 527, affirmed 2 Cir., 73 F.2d 997.

■ Nor is there merit in the Collector's contention that the taxpayer here must deduct from the attorneys' fees an amount attributable to the defense of the 23 shareholders.

As seen, it was the Custodian's plan, which was the plan of the taxpayer and for its benefit, that these particular 23 become its shareholders to assure its continued control by them through their ownership of 50% of the company's shares, which required but one of the 614 other shareholders to continue it. Through the taxpayer's purpose in thus bringing them into the corporation, they, though innocent, are compelled to participate in the defense of a suit which, if not defended, would have destroyed the corporation's business by subjecting all its properties, sought to be sequestered by the court for that purpose, to a judgment of between $10,000,000 and $12,500,000.

The court below found the value of a participancy of the 23 co-defendants in the defense of the case, stating that "the liberal aid of the contributors and their steering committee * * * [supplied] many facilities and influences such as could not have been supplied by the management of American Factors acting alone." [76 F. Supp. 135.]

In Figge v. Bergenthal, 130 Wis. 594, 625, 109 N.W. 581, 592, 110 N.W. 798; Solimine v. Hollander, 129 N.J.Eq. 264, 19 A.2d 344; and In re E. C. Warner Company, Minn., 45 N.W.2d 388, innocent directors, sued in stockholders' derivative suits, had to defend themselves from personal liability. Nevertheless, the corporation was held liable for the entire litigation expense. Here the case is even stronger, for the innocent shareholders defended not only themselves, but also their corporation from a judgment most likely to destroy it.

The district court should have computed the taxpayer's claim for refund by allowing a deduction only for the litigation expenses of $87,992.50 paid in 1932.

*The District Court's Disallowance of the Deduction of the Litigation Expense in 1924, 1925 and into 1926.*

■ During this period up to the exoneration of the 23 by the trial judge's decision in 1926, the litigation costs amounting to $396,812.50 had been paid by the taxpayer, being repaid from time to time during that period by 22 of the group of 23 shareholder co-defendants. This was done under an arrangement between the taxpayer and these shareholders, the character and the effect of which is the subject of dispute here. In 1932 this sum was paid by the taxpayer to the 22 shareholders or the successors in interests of some of them and claimed as a deduction in its income tax return of that year. The deduction was disallowed and the district court held that the Commissioner had not erred in the disallowance.

The ground of the court's holding is that the payments of the 22 were voluntary, without thought of reimbursement from the taxpayer and, in effect, a gift. This finding was based upon a preceding finding that there is *"no evidence"* that the taxpayer ever "promised or implied an intention to reimburse its co-defendants in the Hackfeld litigation at the time they subscribed or made their contributions toward the expense of conducting that litigation, and there is *no evidence* that plaintiff even considered the matter until the litigation was finally concluded in 1932." (Emphasis supplied.) The finding that there was "no evidence" to support any other arrangement than that of a gift is clearly erroneous.

In anticipation of litigation, 22 of the 23 shareholders entered into an agreement

among themselves to advance to the taxpayer the costs of litigation. The uncontradicted testimony of taxpayer's then treasurer, Sherwood M. Lowrey, is that the 22 appointed a "steering committee" for their group composed of Messrs. Allen W. T. Bottomley, the president of the taxpayer, C. R. Hemenway, F. C. Atherton and R. A. Cooke. As the litigation developed, it would be necessary for somebody to put up the cash to pay bills as they were presented. The taxpayer acted as banker for the committee and as such received and paid the bills as approved by the committee. The committee approved all the larger bills, and treasurer Lowrey was instructed by Mr. Bottomley, both president of the taxpayer and chairman of the committee, to settle all ordinary minor bills in connection with the suit. After a considerable amount had been paid out, Lowrey estimated the number of dollars per share it would take to offset the amounts paid out for expenses from time to time, and then this amount per share was assessed among the members of the group on a per share basis and was paid in.

The payments of litigation expenses as they were made were entered in the books of the taxpayer in an account entitled "Hackfeld litigation expense" as deferred items, and American Factors paid from time to time all the expenses of the Hackfeld litigation, which totaled $568,607.76. The items of payment and the amounts thereof are shown in the tabulations in evidence.

During the early period of the Hackfeld litigation, $396,812.50 of the litigation expenses was pro rated among 22 of the Hackfeld defendants who were charged with fraud and conspiracy in the litigation proportionately to their original stock subscriptions in American Factors, and these 22 Hackfeld defendants, by about the end of the year 1925 or early January, 1926, had paid to American Factors sums which totaled $396,812.50 on account of litigation expenses. The question as to whether or not the Hackfeld defendants or American Factors would ultimately pay the expense of litigation was not then determined.

It is not for this court to attempt to draw the possible inferences from Lowrey's above testimony, which was heard by the court below. One possible inference is that what the 22 shareholders did was to lend the money to the taxpayer and that the repayment in 1932 was the mere non-deductible repayment of a loan. If this were the case, the taxpayer should have deducted the expenses in the year it paid them.

Another inference which might be drawn is that the money paid by the taxpayer was advanced by it on behalf of the 22 shareholders who so had agreed to pay the litigation costs. In that event, the transaction was similar to that in Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157. There a holder of bonds of the Florida Railroad Co. successfully brought litigation on behalf of himself and other bondholders against the trustees for wrongfully dissipating the assets held in trust to secure the bonds. The litigating bondholder had a personal interest in the outcome of the litigation, as here had the shareholders. There, as here, the result of the litigation was the protection of the assets, there, of the properties securing the corporate debt; here, protection of the properties of the taxpayer from a destructive execution on them. The Supreme Court held that the bondholder could recover his litigation costs out of the fund the litigation had protected, citing many authorities stating the law to be, 105 U.S. at pages 532–533: "that where one of many parties having a common interest in a trust fund, at his own expense takes proper proceedings to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement, either out of the fund itself, or by proportional contribution from those who accept the benefit of his efforts."

The same principle was restated in Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 164 et seq., 59 S.Ct. 777, 83 L.Ed. 1184. These were cases in the equity jurisdiction as in the Isenberg case where equitable relief was sought on the charge of fraudulent conspiracy.

Also if the payment of the litigation expenses were an advance on behalf of the

23 shareholders, made such to give continuity to their control of the taxpayer, the principles controlling in the stockholders derivative suits, cited supra, are applicable.

### The Waterhouse agreement.

■ In November, 1930, the effects of the world business depression began to be felt in Hawaii. In 1931 the Henry Waterhouse Trust Company, Limited, was conducting business as usual but was encountering some financial difficulties. To prevent a failure which might disasterously affect general business conditions, several corporations and persons joined in a plan for the liquidation of the Waterhouse obligations. The Bishop Trust Company, Limited, agreed to acquire the outstanding Waterhouse shares, take over its business and liquidate all its obligations, provided that certain cash contributions were made by several persons and corporations.

Taxpayer was one of eight who paid in 1931 a total of $400,000 to Waterhouse, taxpayer paying $50,000 thereof. It received an instrument called a note, promising to pay it $50,000 "only when, if and to the extent that," after all the indebtedness and liquidation costs of Waterhouse had been discharged, it still had assets from the sale of which all or part of the $50,000 could be paid.

The taxpayer contends that the $50,000 is deductible, under the Revenue Act of 1932, from its 1932 income either as (a) a bad debt, or (b) an ordinary and necessary business expense, or (c) a loss. The district court, as in Alexander & Baldwin, Ltd., v. Kanne, 9 Cir., 190 F.2d 153, did not consider these contentions, since it held that the payment to the Waterhouse Company was just a "contribution" and not a tax deduction in any year. For the reasons stated in the Alexander & Baldwin case, supra, we hold that the court erred in treating the $50,000 as a contribution, but that its deduction must be denied on the grounds there stated.

It is true that the taxpayer here is on the accrual basis, while Alexander & Baldwin is on a cash basis. We think that this makes no difference. If it be argued that the $50,000 paid in 1931 is a business ex-

pense, it is impossible, looking forward from 1931, to determine what may be paid on the Waterhouse contract and, if nothing, in what future year that will be determined. If the $50,000 be a business expense it is deductible only for the tax year 1931.

The judgment is reversed and the case remanded to the district court for its findings on the evidence adduced on the issue of the claimed deduction of $396,812.50 and for it otherwise to determine the amount of the refund, in accord with this opinion.