THE COLD METAL PROCESS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 22486.    Promulgated December 4, 1951.

*Howard F. Burns, Esq., William H. Fleming, Esq., Warren Daane. Esq.,* and *L. C. Weiss, C. P. A.,* for the petitioner.

*Thomas F. Callahan, Esq., Thomas V. Lefevre, Esq.,* and *A. J. Friedman, Esq.,* for the respondent.

918

OPINION.

RAUM, *Judge:* 1. The correctness of the deficiencies asserted against petitioner turns largely on whether petitioner realized income in 1945 as a result of the settlement of certain patent controversies. The amounts involved in the settlements were not in fact received in 1945, and petitioner contends not only that such amounts were not properly accruable in that year, but also that even if they were then accruable they must be ascribed to the so-called charitable trust rather than to petitioner. However, it becomes of no moment to determine to whom such amounts would be accruable, if we conclude that they were not income in 1945 for a taxpayer on the accrual basis.

Prior to 1945, petitioner had become the owner of two patents covering a method and apparatus for the cold rolling of sheet metal. The validity and infringement of those patents became the subject of much dispute and gave rise to a considerable volume of litigation. Numerous steel manufacturers were charged by petitioner with infringement, and some of them entered into settlement and license agreements. Others, however, refused to come to terms, and during 1942 and 1943 petitioner started suits against a number of them.

At about the same time, there were two important developments respecting these patents. First, in August and September 1943, several Federal departments and agencies issued notices, under the Royalty Adjustment Act (35 U. S. C. secs. 89–96), declaring that the royalties being charged the United States directly or indirectly under petitioner's patents were believed to be unreasonable and excessive. Thereafter, on December 29, 1944, an order was issued which, with one exception not here material, fixed at zero the royalties so chargeable under these patents, and directed named licensees under the patents to deposit in the United States Treasury royalties payable "in excess of" those authorized by the order.

Secondly, in July 1943, the United States brought suit (referred to herein as the "cancellation suit") in a Federal district court for the cancellation of the two patents, or important portions thereof, on the ground that their issuance by the Patent Office had been induced by fraud or mistake. On motion of the United States, and over the vigorous opposition of the defendants in that suit, the District Court issued an interlocutory order on October 10, 1944 (referred to herein as the "impounding order"), effective until entry of final judgment by the District Court, which restrained petitioner and its officers and agents from receiving any further monies on account of the two patents, whether as royalties or damages or payments in settlement of infringement claims; required such monies to be deposited in the registry of the court; and enjoined transfer of the patents in any

manner. *United States* v. *Cold Metal Process Co.* (N. D. Ohio), 57 F. Supp. 317.

The cancellation suit was decided by the District Court against the United States as to all matters in issue, and final judgment was entered on September 20, 1945 (N. D. Ohio), 62 F. Supp. 127. The United States took an appeal, and then moved before the District Court for reinstatement of the impounding order pending determination of the appeal. This motion was granted on October 8, 1945, again over petitioner's opposition.

While the cancellation suit was in this posture, six steel manufacturers agreed to a settlement of the suits brought against them by petitioner and of the claims against them under the two patents. With full knowledge of the cancellation suit and the charges made therein by the United States, and with complete awareness of the outstanding impounding order, these companies executed settlement agreements dated December 29, 1945, in which they consented to make payments to the clerk of court in the cancellation suit in the aggregate amount of $9,000,000. They agreed, moreover, that such payments would be unconditional and they undertook to waive all claim to have the funds returned to them "under any condition whatsoever."

A settlement agreement with substantially identical terms was executed by Inland Steel Company on December 31, 1945, settling the infringement claims against it for $600,000, which was paid into court by Inland on the same date. Two further settlements were executed on December 29, 1945, on similar terms, with Allegheny-Ludlum Steel Corporation and its subsidiary, Wallingford Steel Company. The former agreed to pay $700,000, and the latter $300,000. It was not until July 9, 1947, that these sums were paid, being deposited at that time with the clerk of the court.

The judgment of the District Court in the cancellation suit was affirmed by the Court of Appeals in December 1947. *United States* v. *Cold Metal Process Co.* (C. A. 6), 164 F. 2d 754. A petition for certiorari was denied by the Supreme Court of the United States in May 1948, 334 U. S. 811, as was a petition for rehearing in June 1948, 334 U. S. 835. A motion was then filed with the District Court to release the imponded funds, and it ordered their release, but not prior to June 25, 1948.

Meanwhile, in March 1947 the United States had started a second suit (referred to as the "Thomas Steel royalty suit") in the same District Court based on the royalty adjustment order of December 29, 1944. The suit was brought to collect monies alleged to be due under that order and which improperly, so it was alleged, had not been deposited in the United States Treasury, and to determine rights

to those monies. It was in this suit that Allegheny and Wallingford paid $1,000,000 into the District Court. On June 25, 1947, a second series of notices was issued under the Royalty Adjustment Act in reference to these patents, and a second royalty adjustment order was issued on June 11, 1948, which also fixed the royalties at zero. The licensees, to which these notices and this order were directed, consisted almost entirely of the Allegheny and Wallingford companies and the manufacturers which had deposited $9,600,000 with the court in 1945 in the cancellation suit, in which these monies were then still impounded. Then, two days before June 25, 1948, the date on which withdrawal of these impounded funds from the court was authorized, the United States started a third suit (referred to as the "Youngstown royalty suit") based on this last royalty adjustment order, and alleged that the impounded funds were affected by this order, and that they therefore should either continue to be held by the court or be paid into the United States Treasury.

Together with the filing of its complaint in the Youngstown royalty suit, the United States filed a motion for a temporary restraining order and a preliminary injunction *pendente lite* to bar the clerk of the court from paying out the impounded funds. The restraining order was granted, but thereafter the preliminary injunction was denied on July 6, 1948, on the ground that the Royalty Adjustment Act did not apply to monies paid in settlement of infringement claims. *United States* v. *Youngstown Sheet & Tube Co.* (N. D. Ohio), 81 F. Supp. 996. An appeal followed, and this denial was sustained by the Court of Appeals on December 6, 1948 (C. A. 6), 171 F. 2d 103. Pending this appeal, the Court of Appeals had authorized withdrawal of the impounded funds from the District Court on July 26, 1948, provided they were deposited with the Federal Reserve Bank at Cleveland. No further attempt at review being made, the District Court permitted withdrawal of these funds from the Federal Reserve Bank on January 7, 1949.

With the termination in this manner of the Youngstown royalty suit, an order was entered in the Thomas Steel royalty suit by the District Court on January 12, 1949, permitting withdrawal of the $1,000,000 deposited by the Allegheny and Wallingford companies.

This summary statement demonstrates, in our opinion, that at the close of 1945 there was considerable doubt, because of the position taken by the United States, that petitioner, or anyone who might stand in its place, had a right to the settlement funds, totalling $10,600,000, which respondent says must be accrued for that year. The Government then appeared to be firmly convinced, and was strenuously acting on its conviction, that the two patents had been improperly obtained, were invalid, and ought to be cancelled, and

that petitioner, or anyone who might stand in its place, was not entitled to enjoy and retain any benefits under these patents. Included in such benefits were these settlement funds, and the Government was plainly determined to exercise every legal means to deny them to petitioner or any of its successors.

The steel companies, it is true, as part of their settlement had explicitly agreed to forfeit all right to the return of these monies, which, except for the $1,000,000 undertaken to be paid by the Allegheny and Wallingford companies, they actually paid into court prior to the end of 1945. But the Government was nevertheless contending that petitioner, or anyone in its place, had no right to those monies, and that the fruits of the patents had to fall with the patents. The Government was successful in obtaining a court order requiring payment into court *pendente lite* of funds due under these patents, including the settlement payments, and subsequently fought repeatedly and with success to have these funds remain impounded in court until final decision of the suit on appeal some years later, notwithstanding petitioner's vigorous attempts to have the impounding order modified so as to release the funds paid in by the steel companies.

It is immaterial that the steel companies had agreed to abandon any claim to the return of their settlement payments. The important thing is that peititoner's right to these payments was being contested by the United States. The Government was contending that it, as well as others, was being injured as a result of patents issued to petitioner through fraud or mistake, and that the dictates of equity required that the patents be cancelled and that petitioner be shorn of all its gains thereunder. Accordingly, notwithstanding the disclaimers of the steel companies of their rights to the possible return of the settlement payments, the Government persistently blocked every effort to have the impounding order modified so as to permit the release of those funds.

The Government's position in this connection is reflected by the argument made in January 1948 in its brief to the Court of Appeals, requesting a stay of that court's mandate of affirmance in the cancellation suit in view of its announced intention to file a petition for certiorari with the Supreme Court. Petitioner had countered with a motion to vacate or modify the impounding order, emphasizing the complete surrender by the steel companies of any interest in the fund. The Government declared:

The contracts [of settlement] in question carry a provision [the waiver] of the general type suggested, but obviously should plaintiff ultimately prevail in this action and, as would inevitably follow in such circumstance, should the existing injunction be made permanent forbidding defendants from collecting or receiving any benefits or gains by virtue of their fraudulent acquisition of the patents here charged to be tainted with fraud in procurement, this pro-

vision [the waiver], strictly between the parties, would be inoperative since equity will not permit a defrauder to profit by his fraud. Where the impounded funds would go should plaintiff prevail here is a matter of no present concern to this Court, we respectfully urge, beyond the certainty that under such circumstances the moneys would not go to defendants.

Thus, the right of petitioner to obtain the impounded funds was being contested, and successfully so, for some three years after the close of the tax year here involved. Meanwhile, the funds were withheld from it, and there was no certainty that its right thereto would ever be established. In the circumstances, it could not be required to accrue the amounts involved as income in 1945. Under the accrual system a taxpayer may be charged with an item of income where its right has been established or is uncontested and where merely the time of payment is postponed to some future date. But petitioner's right to the amounts herein was seriously disputed in 1945, and it was that very dispute that effectively prevented petitioner or its successor from receiving payment in that year.

Nor is a different result called for because the Government was uniformly unsuccessful on the merits of its claims. Where claims are not advanced frivolously and are made in good faith, a taxpayer is not required to evaluate his chances of success for the purpose of determining whether an item is to be accrued. Cf. *E. T. Slider, Inc.*, 5 T. C. 263, 268. It is sufficient that the right is in fact in contest, and accrual must await resolution of the dispute. Cf. *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, 423; *Lucas* v. *American Code Co.*, 280 U. S. 445, 451; *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516; *Boston Elevated Railway Co.*, 16 T. C. 1084; *William Justin Petit*, 8 T. C. 228; *London-Butte Gold Mines Co.*, 41 B. T. A. 852, affd. (C. A. 10), 116 F. 2d 478. No part of the $10,600,000, here involved, was received by petitioner in 1945, and as a result of the claims being advanced by the United States, petitioner's right to that amount had not yet been established so as to require accrual in that year. We conclude that to the extent that the deficiencies asserted by the Commissioner are based upon including that amount in petitioner's 1945 income they must be disapproved.

2. The remaining question concerns respondent's disallowance for 1945 of a deduction for the legal fees of two law firms, Stebbins, Blenko & Webb and Baker, Hostetler & Patterson. The bills for these fees were not issued, and petitioner was not notified of the charges made thereby, until the early months of 1946. The Baker fee was for services rendered almost entirely in connection with the cancellation suit, and amounted to $90,000, besides a charge of $1,577.34 for cash disbursements. The Stebbins fee was for services in petitioner's patent matters over a period of years including 1945, and amounted to $35,000. On receipt of these bills in 1946, petitioner recorded them

in its books as of December 29, 1945, and claimed a deduction for the entire amount for 1945. The Baker bill was paid in installments in 1946, 1948, and 1949, and the Stebbins bill was fully paid in 1949.

For 1945 respondent allowed a deduction of $1,577.34 for the cash disbursements, but disallowed the remainder of the billed charges. His position is that the fees were not accruable for 1945, and that they were capital expenditures rather than current expenses. We hold that they were not accruable for 1945.

Petitioner's auditor in 1945 testified that the regular method of bookkeeping was to debit its Accrued Legal and Auditing Expense account as "bills were received during the year." [2] He made it clear, upon being pointedly asked, that the Accrued Legal and Auditing Expense account was a reserve account, to which were charged bills which it was anticipated would be rendered. But bookkeeping entries made in reserve accounts to reflect expected expenses are not acceptable as a basis for deductions for income tax purposes in the absence of specific statutory authorization, and such anticipatory charges made in 1945 would not support deduction of these amounts in that year. Cf. *Lucas* v. *American Code Co.*, 280 U. S. 445; *Brown* v. *Helvering*, 291 U. S. 193; *Gude Brothers, Kieffer Co.*, 2 B. T. A. 1029.

While it may have been certain during 1945 that there was some liability for legal services, the amount was undetermined in that year, and there is no evidence that it could have been estimated with reasonable certainty before the end of that year. No proof was made that an amount of compensation had been agreed upon, or that there was any arrangement between petitioner and its attorneys which would have enabled it to make a reasonably accurate estimate of the charge to be rendered. Indeed the contrary is suggested by the fact that petitioner's first bookkeeping entry, actually recording in its accounts payable its liability to the Baker and Stebbins firms, was not made until 1946 on the issuance of the invoices, although the entry was dated back to 1945. On the evidence before us, the liability represented by the fees in these bills was not accruable for income tax purposes before the bills were rendered in 1946. Cf. *Crown Cork & Seal Co.* v. *United States*, (E. D. N. Y.) 4 F. Supp. 525, 527, aff'd. per curiam (C. A. 2) 73 F. 2d 997; *Kanne* v. *American Factors* (C. A. 9), 190 F. 2d 155, 160–161; *New Process Cork Co.*, 3 B. T. A. 1339, 1342; *Canton*

---

[2] A. This [Accrued Legal and Auditing Expense Account] is a liability on the accounts of the company when the company was active, and it was created for the purpose of reflecting an accrued legal and auditing expense at the end of each year. We maintained a balance in this account of $100,000. As bills were received during the year, attorneys and auditors, and so forth, they were charged against this account, and provision was made by a charge against an expense account to restore the balance to $100,000 at the end of each year.

Q. It was the regular practice, was it, to keep a balance of $100,000 in this accrued— in this account at the end of each year?

A. Yes,

*Cotton Mills* v. *United States* (Ct. Cl.), 94 F. Supp. 561, 565–566. It therefore becomes unnecessary to decide whether the expenditure for these fees was a current expense or a capital charge, although there appears to be substance to respondent's contention that it was, at least in largest part, a capital expenditure. Cf. *Porter Royalty Pool, Inc.,* 7 T. C. 685, 699–700, affd. (C. A. 6) 165 F. 2d 933, certiorari denied 334 U. S. 833; *Safety Tube Corporation,* 8 T. C. 757, 762–764, affd. (C. A. 6) 168 F. 2d 787; *South American Gold & Platinum Co.,* 8 T. C. 1297, 1302, affd. per curiam (C. A. 2) 168 F. 2d 71; *Addison* v. *Commissioner* (C. A. 8) 177 F. 2d 521.

*Decision will be entered under Rule 50.*