## BOSTON ELEVATED RY. CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 3780.

Circuit Court of Appeals, First Circuit.

Nov. 4, 1942.

162

Charles W. Mulcahy, of Boston, Mass., Robert N. Miller, of Washington, D. C., and John H. Moran, of Boston, Mass., for petitioner.

Joseph N. Jones, Sp. Asst. to the Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and Helen R. Carloss, Sp. Assts. to the Atty. Gen., and J. P. Wenchel, Chief Counsel, and John W. Smith, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for Commissioner.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

During the years 1933–1937 the Commonwealth of Massachusetts paid certain sums to the Boston Elevated Railway Company, petitioner herein, to make up deficiencies in operating revenue. The Elevated Company did not report these sums as part of its gross income in its federal income tax returns for the years in question. The Board of Tax Appeals, in its decisions now under review, held that these sums should have been so included, and redetermined deficiencies accordingly. We think that these decisions were right.

Since July 1, 1918, petitioner had been managed and operated under the provisions of chapter 159 of the Massachusetts Special Acts of 1918, and acts amendatory thereto,[1] hereinafter referred to collectively as the Public Control Act. This act has been before the Supreme Court in other connections, in City of Boston v. Jackson, 1922, 260 U.S. 309, 43 S.Ct. 129, 67 L.Ed. 274, and in Helvering v. Powers, 1934, 293 U.S. 214, 55 S.Ct. 171, 79 L.Ed. 291.

The Public Control Act provides for the management and operation of the Boston Elevated Railway Company by a board of trustees appointed by the Governor. The trustees are empowered, during the period of public operation, to exercise all the rights and powers of the company and its directors, and, on behalf of the company, to receive and disburse its income and funds. They may appoint and remove all the officers of the company other than the board of directors. The trustees are "deemed to be acting as agents of the company and not of the commonwealth, and the company shall be liable for their acts and negligence in such management and operation to the same extent as if they were in the immediate employ of the company, * * *." The trustees have power to make contracts in the name of and on behalf of the company, and to issue stocks, bonds and other evidences of indebtedness of the company. Though directors continue to be elected by the stockholders, the board of directors, during the period of public operation, has no control over the management and operation of the railway system.

It was further provided that the company, prior to or at the time of its acceptance of the act, should provide for raising $3,000,000 in cash by the issue of preferred stock. $2,000,000 of the fund so raised was put at the disposal of the trustees to pay for the cost of additions and improvements to the company's property. The remaining $1,000,000 was set aside as a reserve fund to be used only for the purposes hereinafter specified.

The trustees were empowered, from time to time, to fix such rates of fare as would reasonably insure sufficient income to meet "the cost of the service", a phrase defined in the act as including operating expenses, taxes, rentals, interest on indebtedness, allowances for depreciation, obsolescence and losses, and all other expenditures properly chargeable against income or surplus, and, in addition, fixed dividends on outstanding preferred stock, and dividends on the common stock of the company at the rate of 5% per annum on the par value thereof during the first two years, 5½% during the next two years, and 6% during the balance of the period of public operation.[2] No dividends may be paid upon the common shares in excess of the rates so specified.

Detailed provision is made for the use of the reserve fund above mentioned. Section 8 of the Public Control Act provides that this fund "shall be used only for the purpose of making good any deficiency in income as provided in section nine or for reimbursing the commonwealth as provided in sections eleven and thirteen, * * *." Section 9 provides that whenever the in-

---

[1] Mass.Spec.Acts 1919, Ex.Sess., c. 244, c. 245; Mass.Acts 1931, c. 333; Mass. Acts 1935, c. 99.

[2] By chapter 333, § 2 of the Acts of 1931, dividends payable upon the common stock and included in the "cost of service" were reduced from 6 to 5% for the remainder of the period of public operation.

come of the company is insufficient to meet the cost of service, as defined, "the reserve fund shall be used as far as necessary to make up such deficiency, and whenever, on the other hand, such income is more than sufficient to meet the cost of the service, the excess shall be transferred to and become a part of the reserve fund." Section 11 (as amended by Special Acts of 1919, Ex.Sess., c. 244) reads as follows:

"If, as of the last day of June [3] in the year nineteen hundred and nineteen, or the last day of any June thereafter, the amount remaining in the reserve fund shall be insufficient to meet the deficiency mentioned in section nine, it shall be the duty of the trustees to notify the treasurer and receiver general of the commonwealth of the amount of such deficiency, less the amount, if any, in the reserve fund applicable thereto, and the commonwealth shall thereupon pay over to the company the amount so ascertained. * * * If, as of the last day of any June thereafter during the period of public operation, the reserve fund shall exceed the sum originally established, the trustees shall apply the excess, so far as necessary, to reimbursing the commonwealth for any amounts which it may have paid to the company under the provisions hereof, and the commonwealth shall thereupon distribute the amount so received among the cities and towns in which the company operates, in proportion to the amounts which they have respectively been assessed as provided in section fourteen. * * *"

Section 13 provides:

"* * * If the period of public management and operation expires, control of the property shall then revert to the company, and if at that time the reserve fund shall be less than the amount originally established because the income during the period of public management and operation has been insufficient to pay the cost of the service, the commonwealth shall forthwith pay over to the company an amount sufficient to restore it to its original amount; and if the amount in said reserve fund is then in excess of the amount originally established and any amount required to meet the cost of the service to the expiration of such period, such excess shall be paid into the treasury of the commonwealth and distributed among the cities and towns

in which the company operates in the same proportion as the assessments provided for by section fourteen."

Section 14 provides that the amount of any deficiency payments which may be made by the Commonwealth to the company under the aforesaid provisions of § 11 and § 13 shall be assessed upon the cities and towns in which the company operates by an addition to the state tax next thereafter assessed.

It was originally provided, in § 12 of the act, that the Commonwealth should have the right to terminate public operation at the expiration of a ten-year period, or at any time thereafter, by appropriate legislation passed not less than two years before the date fixed for such termination. Chapter 333 of the Acts of 1931 provides that public management and operation shall continue until July 1, 1959, and thereafter, unless terminated on said date or thereafter by appropriate legislation passed not less than two years before the date fixed for such termination.

During the first year of public operation the Commonwealth was obliged to make a deficit payment to the company of nearly $4,000,000 under the provisions of § 11 of the act. In the succeeding years operating earnings improved and by the end of 1931 the Commonwealth had been reimbursed for all the sums it had theretofore paid to the company for deficiencies. In 1932 this favorable trend of earnings was reversed; and during the taxable years now in question, 1933 to 1937, the Commonwealth paid to the company for deficiencies, as provided in § 11, sums averaging nearly $2,000,000 each year. These payments were credited on the company's books to the account designated "Profit and Loss". The reserve fund, above described, was exhausted in 1931 and has not been restored in any amount.

During the years 1933 to 1937 dividends in the amount of $1,193,970 were paid annually to the stockholders of the company.

Petitioner urges that the Board erred in holding that its receipt of the deficiency payments made by the Commonwealth constituted taxable income. It advances the propositions (1) that loans or advances subject to repayment do not constitute income taxable to the recipient, because of the off-

---

[3] As to years subsequent to 1934 this date appearing throughout § 11 has been changed from "June" to "March". Acts 1935, c. 99.

setting obligation, McKnight v. Commissioner, 5 Cir., 1942, 127 F.2d 572; (2) that this is true even though the obligation to repay is contingent or conditioned upon the adequacy of a particular fund, Island Petroleum Co. v. Commissioner, 4 Cir., 1932, 57 F.2d 992; and (3) that the deficiency payments made by the Commonwealth in the case at bar constituted loans or advancements which petitioner was obligated to repay under the conditions specified in § 11 of the Public Control Act.

We think that this is not a correct analysis of the provisions of the act.

The Public Control Act, upon its formal acceptance by the company, evidenced an arrangement between the Commonwealth and the company contractual in nature. The Commonwealth, during the period of public operation, guaranteed the company an income sufficient to maintain a stable rate of dividends. In consideration thereof, the company agreed that the powers of management normally vested in its board of directors should, during such period, be vested in a board of trustees appointed by the Governor; and further, the company agreed that taking such period as a whole, any excess of earnings over the cost of service, as defined, should be turned over to the Commonwealth upon relinquishment of public operation. In other words, by this agreement the company is assured of income sufficient to pay the stipulated dividends, but in no event will the company be able to pay dividends at a higher rate. Its ultimate obligation under § 13 to pay over to the Commonwealth all the excess of earnings over cost of service must be performed even though at the date of relinquishment of public operation the Commonwealth had been reimbursed in full for advances theretofore made and, indeed, even though the Commonwealth had not been obliged to advance one cent under the guaranty. This demonstrates that, taking an over-all view of the whole period of public operation, deficiency payments which the Commonwealth may be called upon to make are not in the nature of loans.

It is true that, from a year-to-year viewpoint, advances made by the Commonwealth under the guaranty bear a superficial resemblance to loans, because of the way in which the reserve fund is applied under § 11. In a particular prosperous year, the excess of earnings over the cost of service goes into the reserve fund. At that time, however large the reserve fund may be,

the most that can be paid to the Commonwealth is an amount sufficient to reimburse it for advances theretofore made; the remainder of such excess earnings stays in the reserve fund for the time being. The reserve fund is designed to level off the ups and downs of annual operating revenues. In a bad year the deficit may be absorbed by the reserve fund without the need of the Commonwealth making an advance to the company and assessing the same upon the cities and towns in which the company operates. If the act had provided that all the excess of earnings over cost of service in a given year should forthwith be paid over to the Commonwealth to be distributed to the cities and towns, the result would have been that in the next bad year the amount specially assessed upon the cities and towns would have had to be correspondingly greater. There would thus have been a much wider fluctuation in the tax rates of the cities and towns due to public operation of the Elevated. The setting up of the reserve fund was only a matter of administrative convenience for the Commonwealth, and does not affect the company's position one way or the other. The reserve fund is under the control of the public trustees; and any excess of earnings over the cost of service, if not applied towards making up subsequent deficits, will ultimately go to the Commonwealth as provided in § 13. The effect would have been no different if the act had provided that at the end of each year any excess of earnings over cost of service should be paid over directly to the treasurer of the Commonwealth, to be held by him as a reserve fund out of which future deficiency payments might be made as needed, any balance at the end of the period of public operation to be distributed to the cities and towns affected. When the function of the reserve fund set up in the act is rightly understood it becomes clear that the direction to the trustees in § 11 to apply the reserve fund from time to time "to reimbursing the commonwealth for any amounts which it may have paid to the company" does not convert the deficit payments made by the Commonwealth into loans, subject to repayment as such.

This case is controlled in principle by the decision in Texas & Pacific R. Co. v. United States, 1932, 286 U.S. 285, 52 S.Ct. 528, 76 L.Ed. 1108. Pursuant to the provisions of § 209 of the Transportation Act of 1920, 41 Stat. 464, 49 U.S.C.A. § 77, federal con-

trol of the Texas & Pacific Railway Company was relinquished by the Government under an agreement by which the United States guaranteed the company a minimum operating income for the ensuing six months, and the company on its part agreed that if operating revenues for the said period should exceed the guaranteed amount, the excess should be paid into the United States treasury. It was held that the amount which the United States was obliged to pay to the railway company under this guaranty constituted taxable income to the company. The present petitioner, by way of distinguishing the Texas & Pacific case, points out that when the United States made its payment under the guaranty, that ended the matter and the railway company was under no obligation to reimburse the federal treasury. But the only difference between that case and this is that here the period of the arrangement is longer—which does not affect the principle involved. During the whole period of public control the Commonwealth guarantees the company an income sufficient to maintain a stable rate of annual dividends. If, during this period as a whole, operating revenues are insufficient for this purpose, the Commonwealth makes up the difference; and upon ultimate relinquishment of public operation the company is under no obligation to reimburse the Commonwealth. On the other hand, if during the period of the guaranty, operating revenues should exceed the cost of service, as defined, the whole of such excess goes to the Commonwealth.

The decisions of the Board of Tax Appeals are affirmed.

