COMMISSIONER OF INTERNAL REVE-
NUE v. BOSTON ELEVATED
RY. CO.

No. 4620.

United States Court of Appeals
First Circuit.

May 21, 1952.

Hilbert P. Zarky, Sp. Asst. to the Atty. Gen. (Ellis N. Slack, Acting Asst. Atty. Gen., Lee A. Jackson and Irving I. Axelrad, Sp. Assts. to the Atty. Gen., on the brief), for petitioner.

Charles W. Mulcahy, of Boston, Mass., for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

The Commissioner of Internal Revenue determined various deficiencies in the income and excess profits taxes of the Boston Elevated Railway Company for the years 1940 to 1943, inclusive. In computing these deficiencies the Commissioner allowed as a deduction for each of the years in question the sum of $50,330.47, representing 1/28 of the sum of $1,409,253.35 which the taxpayer had paid to the Commonwealth of Massachusetts on August 19, 1931, under circumstances which we shall describe later.

Boston Elevated filed a petition in the Tax Court for redetermination of the deficiencies, to which the Commissioner filed his answer. Later the Commissioner filed an amended answer asserting for the first time that he had been in error in allowing the aforesaid yearly deductions of $50,330.47, and that the deficiencies should be correspondingly increased. The Tax Court decided, contrary to the position taken in the Commissioner's amended answer, that the taxpayer was entitled to take these deductions. Though there were many other issues before the Tax Court, the Commissioner, in his present petition to review the decision of the Tax Court, presents only the single contention that it was error to allow this deduction of $50,330.47 for each of the taxable years.

On and after July 1, 1918, Boston Elevated Railway Company was managed and operated by a board of trustees appointed by the governor, under the provisions of Ch. 159 of the Mass.Special Acts of 1918, and Acts amendatory thereto, hereinafter referred to collectively as the Public Control Act. This lasted until August 29, 1947, on which date, pursuant to an option extended to the Commonwealth in the Public Control Act, the Metropolitan Transit Authority acquired the whole assets, property and franchises of the taxpayer as a going concern, under authority of Ch. 544 of Mass.Acts for the year 1947.

We refer to our opinion in Boston Elevated Ry. Co. v. Commissioner, 1 Cir., 1942, 131 F.2d 161, certiorari denied 1943, 318 U.S. 760, 63 S.Ct. 559, 87 L.Ed. 1132, for an extensive recital of the provisions of the Public Control Act. Upon its formal acceptance by the company, the Public Control Act evidenced an arrangement between the Commonwealth and the company contractual in nature. The Commonwealth in effect guaranteed to the company, during the period of public operation, an income sufficient to meet the "cost of the service," defined in the Act, § 6 as including operating expenses, taxes, rentals, interest on indebtedness, allowances for depreciation, obsolescence and losses, and all other expenditures properly chargeable against income or surplus, and, in addition, dividends

at a fixed rate on the outstanding preferred and common stock. On its part the company agreed that, taking the period of public operation as a whole, any excess of earnings over the cost of the service, as defined, should be turned over to the Commonwealth. The company was required to put $1,000,000 into a reserve fund under the control of the board of trustees. If in any year the company's earnings were insufficient to meet the cost of the service, as defined, the reserve fund was to be dipped into to make up the difference. In prosperous years, where the earnings exceeded the cost of the service, the company under § 9 had to transfer to the reserve fund the amount of such excess. If in any particular year the earnings were not enough to meet the cost of the service and the amount remaining in the reserve fund was insufficient to make up such deficiency, the Commonwealth agreed, under § 11, to pay over to the company the amount of such deficiency, less the amount, if any, in the reserve fund applicable thereto, thereby enabling the company to maintain a stable rate of dividends during the period of public operation. If at the end of any fiscal year the reserve fund exceeded the sum of $1,000,000 originally established, the trustees were directed to apply the excess, so far as necessary, to reimbursing the Commonwealth for any amounts which it might have paid to the company to make up deficiencies for prior years. Section 13 of the Public Control Act provided that if at the termination of public management and operation "the reserve fund shall be less than the amount originally established because the income during the period of public management and operation has been insufficient to pay the cost of the service, the commonwealth shall forthwith pay over to the company an amount sufficient to restore it to its original amount; and if the amount in said reserve fund is then in excess of the amount originally established and any amount required to meet the cost of the service to the expiration of such period, such excess shall be paid into the treasury of the commonwealth * * *."

In other words, the company agreed under § 13 that the Commonwealth would re-

ceive all the excess of earnings over the cost of the service, as defined, during the period of public operation as a whole, even though at the date of relinquishment of public operation the Commonwealth had been reimbursed in full for advances theretofore made, and, indeed, even though during the life of the agreement the Commonwealth had not been obliged to advance one cent under the guaranty. On the other hand, if during the period of public operation as a whole the earnings of the company were insufficient to meet the cost of the service, as defined, the Commonwealth having, from year to year, made up the deficiencies in accordance with its commitment, the company at the termination of public operation was under no obligation to reimburse the Commonwealth for the amounts so advanced.

During the years 1933-1937, the Commonwealth paid to Boston Elevated Railway Company certain sums to meet the cost of the service, as defined. We held in Boston Elevated Ry. Co. v. Commissioner, supra, that these payments by the Commonwealth constituted income to which the company was entitled under the aleatory features of the long-term contract with the Commonwealth; and therefore should have been included by the company in its return of gross income for those years. Though we have had no occasion to decide the point, it would seem to follow as a logical corollary—and this indeed the Commissioner asserts as a step in his argument in the case at bar—that if in any particular year Boston Elevated's earnings were in excess of the cost of the service, as defined, its payment of such excess into the reserve fund for the purposes aforesaid, being a payment it was required to make under the provisions of the long-term contract with the Commonwealth, would be an ordinary and necessary business expense deductible in full in the year when made. For the reasons we are about to explain, we think the Commissioner is mistaken in the view that the 1931 payment of $1,409,253.35 now in question was the same sort of payment as those the company was conditionally obliged to make into the reserve fund under § 9 of the Public Control Act, and should therefore have been taken in its entirety as a deduction in 1931.

It was originally provided, in § 12 of the Public Control Act, that the Commonwealth should have the right to terminate public operation at the expiration of a ten-year period (1928) or at any time thereafter, by appropriate legislation passed not less than two years before the date fixed for such termination. 1928 went by without action by the legislature so to terminate public operation.

By Ch. 333 of the Acts of 1931, the Commonwealth offered to continue public management and operation for another 28 years, until July 1, 1959, and thereafter, unless terminated on said date or thereafter by appropriate legislation passed not less than two years before the date fixed for such termination, provided, that the company, in the manner set forth, should make formal acceptance of the various terms and conditions contained in the Act. One of such provisions was that in the computation of "the cost of the service", as defined, dividends on the common stock should be reduced from 6 to 5 per cent. Another such provision—and this is the important one for purposes of the present case—was that out of a special trust fund which Boston Elevated had established pursuant to Ch. 740 of the Acts of 1911, upon its acquisition in 1913 of the property, privileges and franchises of West End Street Railway Company, Boston Elevated should repay to the Commonwealth all amounts which, prior to the effective date of the 1931 Act, the Commonwealth had been obliged under § 11 to pay to the company to meet the cost of the service, as defined, and which had not previously been reimbursed to the Commonwealth.

Boston Elevated duly accepted the provisions of Ch. 333 of the Acts of 1931, and thus procured the commitment of the Commonwealth to a 28-year extension of the period of public management and operation under the terms of the Public Control Act.

Pursuant to the aforesaid provision of the 1931 Act, Boston Elevated on August 19, 1931, paid to the Commonwealth, from the special trust fund established by the company under the 1911 Act, the sum of

$1,409,253.35, which represented, as of the effective date of the 1931 Act, the amount that had not been reimbursed to the Commonwealth on account of its payments theretofore made to Boston Elevated to make up deficiencies in operating revenue in prior years.

█ In the decision now under review, the Tax Court considered that this payment of $1,409,253.35 to the Commonwealth fell within the principle that "an expenditure made in acquiring a capital asset or a contract which is expected to be income producing over a series of years is in the nature of a capital expenditure which must be amortized ratably over the life of the asset or the period of the contract". The Commissioner concedes that this principle is abstractedly a correct statement of law. See, e. g., Home Trust Co. v. Commissioner, 8 Cir., 1933, 65 F.2d 532. But he asserts that it is not properly applicable to the facts of the present case, because the Tax Court was mistaken in its view that the payment of $1,409,253.35 was part of the consideration which the taxpayer had to give "in order to obtain the twenty-eight year extension of the period of public control with its attendant benefits to it, including a guaranteed income."

█ We think it plain that the Tax Court has correctly analyzed the nature of this 1931 payment, and that it properly allowed the payment to be amortized over the life of the extended contract.

If the 1931 Act had not been accepted by Boston Elevated, it would have been under no obligation to reimburse the Commonwealth in the sum of $1,409,253.35 out of the special trust fund which it had established under the 1911 Act. Unless earlier terminated by mutual consent, the period of public control would have lasted at least until 1933, for the Commonwealth had to give a two-year notice of termination. Under the terms of the Public Control Act, the Commonwealth might never have been reimbursed for the sum of $1,409,253.35. The company was only under an obligation to pay into the reserve fund any excess of its income over the cost of the service, as defined. By 1931

such reserve fund had been completely exhausted. If in the succeeding years the company had made income in excess of the cost of the service, such excess would have had to go to restore the reserve fund to its original amount of $1,000,000 before the Commonwealth would have been entitled to anything out of such fund by way of reimbursement. From what we learned in the previous case, 131 F.2d at 163, the chances are that under the original terms of the Public Control Act the Commonwealth would never have been reimbursed for this sum but upon the contrary, under its commitment, it would in succeeding years have had to make still further payments to the company to meet the costs of the service. If the 1931 Act had not been accepted the Commonwealth would probably have exercised its option to terminate the period of public operation, for the bargain did not appear to have been working out favorably from the Commonwealth's point of view.

Obviously, what the company had to do in order to obtain the boon of a 28-year extension of the contract was to agree to make a direct payment to the Commonwealth in the sum of $1,409,253.35 which it was theretofore under no obligation to make. Such payment was, as the Tax Court held, part of the consideration flowing from Boston Elevated in order to obtain the 28-year extension of the period of public control, with the attendant benefit of an income guaranteed by the Commonwealth. The payment was quite different in nature from the payments to the reserve fund which Boston Elevated had to make under § 9 of the Public Control Act in any year when its income exceeded the cost of the service, as defined.

█ It is argued by the Commissioner that the payment of $1,409,253.35 in 1931 "was in satisfaction of a contingent liability", instead of being consideration for the extension of public control; that though the 1931 Act provided a contingent additional source of repayment—the special trust fund which had been established pursuant to the 1911 Act—"the additional contingent source of repayment so provided and out of which payment was actually

made cannot convert the satisfaction of a contingent debt into consideration for the new legislation." This suggestion that it was a case of Boston Elevated as debtor repaying a loan previously made by the Commonwealth is inconsistent with the Commissioner's other argument that the payment was an ordinary and necessary business expense deductible in its entirety in the year 1931 when it was paid. In fact, payments by the Commonwealth to the company under § 11 of the Public Control Act were not loans, and when received by the company did not constitute debts, contingent or otherwise. The contract obligation of Boston Elevated under § 9 of the Act was to pay into the reserve fund, for the purposes stated, any excess of income over the cost of the service for a particular year; and this obligation did not vary with, and had no relation to, the amount which the Commonwealth might in previous years have paid to the company under § 11, and for which it had not been reimbursed. The company's obligation under § 9 was a constant one during the period of public control, even though the Commonwealth might never have had to make any payment to the company under § 11. All this the Commissioner understood clearly enough in the case which was before us in 1942. Boston Elevated Ry. Co. v. Commissioner, 1 Cir., 131 F.2d 161. In that case the Commissioner's brief stated as follows: "The payments made by the commonwealth were not loans which the company undertook to repay. There was never in any event to be a repayment as such. There was a restriction or limitation throughout the period of operation on the amount of the earnings which the taxpayer could enjoy. Excessive earnings were not to be repaid by the taxpayer but were to remain a part of the reserve fund, or under specified conditions were to be used by the public trustees for the benefit of the commonwealth. An excess, if earned, would not belong to the taxpayer but would at all times remain under the control of the public trustees, eventually vesting in the commonwealth. * * * The taxpayer here was not borrowing money when it found it necessary to rely upon the commonwealth's guaran-

ty, and it was not repaying a loan when it acquiesced, pursuant to the contractual arrangement, for the public trustees to retain any excessive operating income."

 Finally, the Commissioner suggests that maybe Boston Elevated ought to be precluded from claiming this deduction of $50,330.47 for each of the years 1940–1943 because of earlier litigation involving the years 1931 and 1932, in which decisions of the Tax Court were entered in conformity with a compromise and stipulation of the parties. The stipulation is reproduced in Boston Elevated Ry. Co. v. Commissioner, 1941, 45 B.T.A. 906 at 907. We think this suggestion borders on the frivolous for the reason, among others, that the stipulation on its face recited that the decisions to be entered pursuant thereto "shall not be res judicata of the issues involved therein for any taxable years other than those involved in such decisions." When the present case was in the Tax Court, the Commissioner raised no issue of res judicata.

The decision of the Tax Court is affirmed.