Demor, Inc. v. Commissioner. Sidney Gollobin and Lila Gollobin v. Commissioner.
Demor, Inc. v. Commissioner
Docket Nos. 7003-65, 7004-65.
United States Tax Court
T.C. Memo 1968-279; 1968 Tax Ct. Memo LEXIS 19; 27 T.C.M. (CCH) 1496; T.C.M. (RIA) 68279; December 3, 1968. Filed Alfred W Kiefer, 140 Main St., Hackensack, N. J., for petitioners. Alan M. Stark, for respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in the Federal income tax of petitioner, Demor, Inc., and additions to tax under section 6651(a) of the Internal Revenue Code of 1954[1] for the fiscal years ended August 31, 1960, through August 31, 1963, as follows: Fiscal year
ended Au-
Income
Additions
gust 31
Taxes
to Tax
1960
$662.44
$ 33.12
1961
592.49
114.93
1962
500.69
1963
455.90
18.23
*22 Respondent determined deficiencies in the Federal income tax of petitioners Sidney and Lila Gollobin for the taxable years 1959 through 1962 as follows: Taxable Year
Income Taxes
1959
$2,649.08
1960
3,893.82
1961
3,370.48
1962
3,551.01
Certain issues have been settled by the parties. The only issue remaining for decision in Docket No. 7003-65 is whether certain advances of funds to corporate petitioner, Demor, Inc., represented genuine indebtedness so that interest allegedly accrued thereon in the years ended August 31, 1960, through August 31, 1963, is deductible under section 163. 1497 In Docket No. 7004-65, relating to the liability of petitioners Gollobin, the remaining issues are as follows: (1) Whether petitioners, for the years 1959 through 1962, may deduct under section 162(a)(3) rent liability to Demor, Inc., to the extent that such liability was satisfied by the issuance of unsecured notes; (2) Whether the proper year to report in petitioners' Federal income tax return use and occupancy insurance proceeds was the year of receipt, i.e., 1959. (3) Whether petitioners, for the years 1959 through 1962, may deduct expenses allocable to *23 the business use of their personal residence and, if so, in what amounts; (4) Whether petitioners must report as taxable income withdrawals of merchandise from the business by Lila Gollobin in each of the years 1959 through 1962; and (5) Whether any part of the compensation paid for the care of petitioners' children is deductible as a medical expense. Findings of Fact General Some of the facts have been stipulated and are so found. The stipulations and exhibits thereto are incorporated herein by this reference. Petitioner in Docket No. 7003-65, Demor, Inc. (hereinafter referred to as "Demor"), had its principal place of business in Hackensack, New Jersey, at the time of the filing of the petition herein. Demor filed its Federal corporate income tax returns on an accrual basis with the district director of internal revenue, Newark, New Jersey, for the fiscal years ended August 31, 1960; August 31, 1961; August 31, 1962; and August 31, 1963. Petitioners in Docket No. 7004-65, Sidney Gollobin and Lila Gollobin, husband and wife (sometimes referred to herein as Sidney or petitioner, and Lila), were legal residents of West Englewood, New Jersey, when their petition was filed. *24 They filed joint Federal income tax returns for the taxable years 1959, 1960, 1961, and 1962 with the district director of internal revenue at Newark, New Jersey. Issue I: Debt or Equity Contribution Sidney owned and operated a retail women's sportswear business in Hackensack, New Jersey, known as the Knitwear Shoppe. By 1953 expansion of the business required more space. Sidney and Lila Gollobin incorporated Demor on September 25, 1953, with a capital investment of $4,000 ($2,100 contribution by Sidney; $1,900 by Lila) for the purpose of erecting and then leasing to Sidney an addition to be constructed at the rear of the building then leased for the Knitwear Shoppe. Sidney held 21 shares and was president and treasurer of Demor during the years in question; Lila, 19 shares and was vice-president and secretary. There were no other stock holders of record. On September 28, 1953, Demor contracted to lease from the Estate of Henry Pasternack, a third party, the adjoining land on which the addition was to be constructed. The lease, covering a 15-year term from October 1, 1953, to September 30, 1968, provided for an annual rental for the land of $1,200 payable monthly. This agreement *25 permitted construction of the addition to the Knitwear Shoppe by Demor but contained the express proviso that the proposed addition would be used for the sale of women's and children's apparel and sportswear. In addition, the improvements were to become the property of the lessor upon the expiration of the lease. On October 29, 1953, Demor entered into a construction contract for the addition, which was completed during the fiscal year ended August 31, 1954. Its total cost, including construction, extras, and fixtures, was $41,928.22. In financing these improvements, Demor used the initial capitalization of $4,000 and rental income of $7,200 paid in advance under a lease entered into by Sidney, trading as the Knitwear Shoppe, and Demor on October 30, 1953. In addition, in January 1954, Demor borrowed $20,000 from the City National Bank and Trust Company of Hackensack (hereinafter City National Bank). This loan provided for monthly repayments of principal for a period of three years and was personally endorsed by Sidney Gollobin. Finally, Demor received the advancements which are in issue in the sum of $12,000 on various days during the fiscal year ended August 31, 1954, as alleged *26 loans from the trust accounts of Michael and Glenn Gollobin, born in 1947 and 1951, respectively, the only children of Sidney and Lila. On August 27, 1953, Sidney had opened a bank trust account, or "Totten" trust, at City National Bank bearing the designation "Sidney Gollobin ITF Michael Gollobin." On August 27, 1953, Sidney opened a similar account at City National Bank designated 1498 "Sidney Gollobin as custodian for Glenn S. Gollobin." The entries in both bank accounts were identical at all relevant times, and were as follows: With-
Date
drawals
Deposits
Balance
8/27/53
$2,200
$2,200
10/14/53
2,000
4,200
10/14/53
$2,000
2,200
11/19/53
2,000
200
5/ 4/54
2,000
2,200
5/ 4/54
2,000
200 The meneys deposited in both bank accounts on August 27, 1953, October 14, 1953, and May 4, 1954, had belonged to Sidney and Lila. The withdrawals from both bank accounts on October 14, 1953, November 19, 1953, and May 4, 1954, were advanced to Demor, and were used to pay for construction costs of the addition. Demor issued demand notes to Michael and Glenn Gollobin on October 14, 1953, and November 19, 1953, reflecting the respective *27 amounts advanced to Demor on the same date. Demor issued one-year notes to Michael and Glenn Gollobin on December 31, 1954, for the amounts advanced to Demor on May 4, 1954. The notes totaled $12,000, and provided for interest at 6 percent. The notes were extended every year (sometimes for fixed periods up to a year, sometimes as demand notes) until September 1, 1957, at which time they were consolidated with accrued interest into two demand notes to Michael and Glenn Gollobin, each in the sum of $7,319.71. Each succeeding year thereafter, Demor issued new demand notes to Michael and Glenn Gollobin to replace the previous demand notes, adding accrued interest to the principal. All these notes were unsecured and no sinking fund was established. During the taxable years in question no payments of interest or principal were made. Sidney had physical possession and control over the notes during the taxable years in question. Moreover, Sidney did not consult Michael or Glenn, due to their youthful age, as to the creation of the alleged loans, the accrual of interest on the notes, or the annual creation of new notes for larger amounts including the accrued interest. For the taxable years *28 1960 through 1963, Demor claimed deductions under section 163(a) for accrued interest on the loans from the Gollobin children. Respondent disallowed the deductions as follows, determining that there had been no showing that true indebtedness was intended and created: August 31, 1960 - $986.94; August 31, 1961 - $1,046.14; August 31, 1962 - $1,112.84; and August 31, 963 - $1,175.45. Issue II: Deductibility of Rent Liability to Demor Sidney filed tax returns with a Schedule C reflecting the net profit of the Knitwear Shoppe for the tax years in question. He used the cash method of accounting for gross receipts, operating expenses, and for rental expenses to an unrelated third party on the original building occupied by the Knitwear Shoppe. Accounts receivable were averaged out rather than taken on an actual cash basis. Sidney used an accrual method of accounting for purchases of inventory; valuation was the lower of cost or market with 50 percent write-downs. However, he followed no consistent accounting method with regard to deductions claimed for his liability for rent payable to Demor. Pursuant to the lease dated October 30, 1953, and alleged oral amendments subsequent thereto, *29 Sidney, trading as the Knitwear Shoppe, was liable to Demor for rent as follows: Nov. 1, 1953 - $7,200
Nov. 1, 1958 - $7,000
Nov. 1, 1954 - $7,200
Nov. 1, 1959 - $7,000
Nov. 1, 1955 - $7,200
Nov. 1, 1960 - $6,000
Nov. 1, 1956 - $7,200
Nov. 1, 1961 - $5,600
Nov. 1, 1957 - $7,000
Nov. 1, 1962 - $5,600
During the taxable years ended December 31, 1953, through December 31, 1958, Sidney made payments to or on behalf of Demor in excess of his rent liability, with the result that as of December 31, 1958, he was owed the sum of $4,591.93 by Demor. For the taxable years 1959 through 1962, Sidney satisfied his rent liability to Demor as follows: 1959 - Payment to or on behalf of Demor of $204.10; eliminating his credit balance due from Demor of $4,591.93; becoming a debtor to Demor to the extent of $2,203.97 as of December 31, 1959; 1960 - Payments to or on behalf of Demor of $351.88; increasing his debt to Demor by $5,648.12, from $2,203.97 to $7,852.09 as of December 31, 1960; 1961 - Payments to or on behalf of Demor of $404.34; increasing his debt to Demor by $5,195.66, from $7,852.09 to $13,047.75 as of December 31, 1961; 1962 - Increasing his debt to Demor *30 by $5,600, from $13,047.75 to $18,647.75 as of December 31, 1962. 1499 For each of the taxable years 1959 through 1962, Sidney, trading as the Knitwear Shoppe, issued unsecured demand notes without interest to Demor in the approximate amount of his debt at the end of each year. Sidney Gollobin, trading as the Knitwear Shoppe, claimed deductions for rent to Demor as follows: 1953
$ 7,200
1954
7,200
1955
7,200
1956
7,200
1957
7,000
1968
None
1959
14,000
1960
6,000
1961
5,600
1962
5,600 The deduction in 1959 of $14,000 covered his liability for 1958 and 1959, $7,000 of this sum having been paid in 1958. In the notice of deficiency, respondent disallowed the following amounts deducted by petitioner as rental expense due to Demor: 1959, $2,203.97; 1960, $5,648.12; 1961, $5,195.66; and 1962, $5,600. Respondent's explanation was that since the method of accounting employed by petitioner indicated that expenses were claimed on the cash basis, all amounts deducted as rental expense due Demor which were not paid in cash or offset by accounts receivable due from Demor were not allowable. Issue III: Proper Year to Report Use and Occupancy Insurance *31 Proceeds On or about November 11, 1957, a major fire in the Knitwear Shoppe caused it to be closed from that date until April 3, 1958. Sidney was insured against the risk of business interruption by "use and occupancy" insurance. Sidney retained settlement adjusters to negotiate the adjustment of his claim, but their efforts were unavailing. He then retained counsel to institute suit. Suit was instituted on or about February 5, 1959, and thereafter a gross settlement of $32,250 was received as compensation for business interruption for the period of November 1957 through April 1958; net settlement after payment of adjuster and counsel fees was $29,025. Sidney reported in his Federal income tax return for 1959 the entire net proceeds of $29,025, but alleged in his petition that the $29,025 should be excluded from income for 1959. Issue IV: Deductibility of Expenses of Home Office Petitioners maintained an office at the Knitwear Shoppe of approximately five feet by eight feet, containing all the current accounting and book records of the business, two desks, a filing cabinet, and three chairs. One of the desks in the office was used by the bookkeeper and one by Sidney. At all *32 relevant times the Knitwear Shoppe was open from 9:30 a.m. to 6:00 p.m. on Tuesday, Wednesday, and Saturday, and from 9:30 a.m. to 9:00 p.m. on Monday, Thursday, and Friday. Sidney performed some of the Knitwear Shoppe work at his residence, primarily bookkeeping and accounting details, and work required to keep current on style trends. In addition, Lila did Knitwear Shoppe work at their residence, including the keeping of inventory records, planning the buying of inventory, and the placing of special orders for merchandise. Petitioners maintained in one bedroom of their eight-room residence two filing cabinets devoted solely to the Knitwear Shoppe business. In these cabinets they preserved past inventory and sales records. In addition, petitioners kept two desks in the same bedroom; however, these desks contained material in addition to the Knitwear Shoppe records. Sidney also used the den for business purposes, but neither the den nor the bedroom was used exclusively for the Knitwear Shoppe business. Both rooms were substantially larger than the office at Knitwear Shoppe. Lila performed the inventory and other duties of the Knitwear Shoppe at their residence because there was *33 no desk space for her in the Shoppe; moreover, the office at the Shoppe was very crowded with other material. In addition, it would have been impracticable for her to stay alone at the office after the shop was closed, particularly on the days when it closed at 6:00 p.m. Consequently, Lila worked as required at petitioners' residence on the current inventory records after the store was closed five to six nights a week and on Sundays. Petitioners claimed deductions for heat and light on Schedule C of their Federal income tax returns for the taxable years in issue. The following portions of the claimed deductions were attributable to light and heat expenses of their personal residence: Year
Claimed onReturns
PortionAttributable toPersonal Residence
1959
$3,037.19
$516.06
1960
3,016.15
471.62
1961
2,778.69
289.48
1962
2,805.79 1500 Respondent disallowed the cost of the heat and light of petitioners' personal residence as business expenses. Petitioners alleged in their petition that the heat and light expenses claimed as deductions represented a reasonable portion of the maintenance expenses of petitioners' home which were allocable to the business *34 use to which the home was devoted during the years in question. The parties agree that the sum of $1,600 is the annual cost of maintaining and operating the Gollobins' personal residence during the taxable years in question. Issue V: Addition to Taxable Income of Withdrawals of Merchandise Lila served full time as buyer and general manager of the Knitwear Shoppe during the years in question, and she received as compensation $140 per week and 15 percent of the profits. Each full-time employee was allowed annually to withdraw from the Knitwear Shoppe, without charge, clothing suitable for general use with a wholesale cost of $150. Records were kept by crediting to the employee's charge account this clothing allowance. The purpose of the allowance was advertising, at least in part, since it was expected that the employees would wear these articles of clothing both during store hours and for social occasions after hours. Lila also withdrew merchandise from the store in each of the taxable years in question. However, no exact record was kept for her withdrawals. This merchandise had a wholesale cost of at least $150 per year, and was suitable for business and personal use. Sidney, *35 trading as the Knitwear Shoppe, did not subtract this $150 from the total purchases of inventory, nor did he add it to total sales. In the notice of deficiency, respondent decreased purchases of merchandise for inventory purposes by $150 for each of the years 1959, 1960, 1961, and 1962 for the merchandise withdrawn for Lila's personal use. Issue VI: Deductibility of Compensation Paid for Care of Petitioners' Children as Medical Expense Petitioners Gollobin are the parents of two sons: Michael, born in 1947, and Glenn, born in 1951. The births and early childhoods of both children were attended by medical complications. Both were born through cesarean deliveries; Michael received surgical and radium treatments for chest tumors when less than a year old. In 1952, he began to develop allergies and asthma and, in 1960, began to receive injections for these allergies. Glenn, too, developed asthma and required hospitalization for it in 1963. During the taxable years in question and in prior years, both children received very extensive and frequent medical treatments for these ailments and other diseases as well as operations from several doctors. In the years in issue, petitioners *36 employed Niobi Giannitrapani as practical nurse and nursemaid for their two sons. Her name was obtained from an employment agency which supplied nurses, nursemaids and governesses for children. Niobi's employment began in 1954; prior to that time petitioners had employed other nursemaids or nurses for the children since birth. Niobi was employed by the Gollobins until late 1961. She was replaced by a full-time housekeeper. Niobi lived at the petitioners' home and was subject to call for care of the children at all times when she was off duty. She was off duty Wednesdays and alternate Sundays; these days the children were cared for by their mother. Niobi's duties consisted of preparing breakfast, lunch, and supper for the children, paying particular attention to the doctor's orders that they were not to have certain foods. She also prepared breakfast and supper for petitioners. She supervised the children's daily activities, including play and rest. Niobi made the children's beds and cleaned their rooms so that they were free of dust, to which Michael was particularly allergic. She also made the petitioners' beds. The children were at a regular summer camp two months each summer *37 during the years in question; Niobi continued working at the home of the petitioners during such periods. When the children were at camp their diets were not supervised; consequently, it was left up to them to determine what food they should eat. They resided in wooden barracks and their living conditions were typical of outdoor living. During the taxable years in question, petitioners also employed a housemaid who performed the normal housekeeping duties. She came in one or two days a week. The following amounts were paid for such domestic help in 1959, 1960, and 1961, respectively: $445, $440, and $521.50, at the approximate rate of $8 to $9 a day. After Niobi was 1501 replaced by a housekeeper the amount paid for household help jumped to $2,027.36. The wages paid Niobi in the taxable years 1959, 1960, and 1961 were $3,245, $3,270, and $2,297, respectively. On their returns, petitioners claimed deductions for the full amounts paid to Niobi as medical expense. In the notice of deficiency, respondent disallowed the deductions paid to the extent that wages exceeded $250 per year. Petitioners have conceded that only 80 percent of the services performed by Niobi Giannitrapani *38 were attributable to the care, mitigation, or prevention of disease. Ultimate Findings of Fact (1) The advances made to petitioner-Demor from the trust accounts in the names of the Gollobin children were not true indebtedness but constituted risk capital. (2) Sidney used the cash method of accounting as to rent, and thus deductions for rent to Demor are limited to amounts actually paid. (3) Until 1959 all the events had not occurred which fixed Sidney's right to receive the proceeds from the use and occupancy insurance, nor could the amount thereof be determined with reasonable accuracy until then. Sidney was also on a cash basis accounting method as to receipt of proceeds from this policy, and, therefore, correctly reported the proceeds as income in the year received, i.e., 1959. (4) The annual cost of maintaining and operating petitioners' residence to the extent allocable to business use is $100. (5) The merchandise was withdrawn by Lila primarily for personal needs; its use constituted an economic or financial benefit to her, and consequently its cost must be included in petitioners' taxable income. (6) Petitioners-Gollobin have not shown that respondent's determination *39 of the portion of compensation for care of the children allocable to expenditures for medical care is unreasonable. Opinion Issue I: Debt or Equity Contribution Demor contends that the advances of funds made to it from trust accounts established in the names of Michael and Glenn Gollobin, the only children of petitioners Gollobin, constitute valid indebtedness and that, therefore, Demor was entitled to deduct interest accrued on the notes under section 163(a). [2] Respondent, on the other hand, argues that the advances evidenced by the notes were risk capital and not genuine indebtedness, and, consequently, Demor is not entitled under section 163(a) to the claimed interest deduction. The parties have cast their contentions in the traditional debt-versus-equity mold, emphasizing the criteria applied by the courts in determining whether advances to closely held corporations represent debt or equity interests. See, e.g., O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123 *40 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court; John Town, Inc., 46 T.C. 107, 127 (1966), affd. per curiam - F. 2d - (C.A. 7, 1967). Under these criteria, it seems quite clear that the advances will not support the claimed interest deductions.[3]
While the form of the purported notes - unconditional obligations to pay fixed sums, bearing a specified rate of interest, and carrying no voting rights - provides some support for petitioners, form alone is not determinative. Charles E. Curry, 43 T.C. 667, 687 (1965). The purported notes outstanding in the years before the Court were demand notes, having no fixed maturity dates; no payments of interest or principal *41 had been made on the notes or the obligations represented by them since their purported creation in 1953; no security or sinking fund to assure repayment was provided. The advances represented by the notes, moreover, were used to acquire Demor's sole income-producing asset. Demor argues that there was no identity between the stockholders, Sidney and Lila, and the "creditors," the children aged six and two years in 1953. But taking into account the youthful age of the children and Sidney's acts in the name of Demor of unilaterally creating and extending the purported loans from year to year without making payments of any kind, we do not 1502 think Demor's argument has weight. See Motel Company v. Commissioner, 340 F. 2d 445 (C.A. 2, 1965), affirming a Memorandum Opinion of this Court; cf. Hoguet Real Estate Corporation, 30 T.C. 580, 599-600 (1958). More important, perhaps, this whole arrangement had none of the characteristics of arm's-length dealing. Demor's sole asset was an addition to a building which was occupied by Sidney's store and was located on a lot leased for 15 years from the Pasternack Estate. Demor financed the construction of the *42 addition with the $4,000 admittedly contributed as capital, $7,200 paid by Sidney as advanced rent, $20,000 borrowed from a bank, and the $12,000 purportedly advanced by the children. Sidney had placed the $12,000 in the bank by three separate deposits and had almost simultaneously withdrawn each deposit to make the loans to Demor. The bank required Sidney to endorse Demor's $20,000 note, which was paid in full in less than three years, as a condition to granting the loan. In contrast, Sidney withdrew and loaned the purported Totten Trust funds to the corporation without any guaranty or other security. At the end of the 15-year lease period, Demor's interest in the building was to expire and Demor's assets would then consist only of its accumulations of the rental income received from Sidney. Yet, after Demor paid off the $20,000 loan to the bank and added some fixtures following the 1957 fire, Sidney merely accrued most of his obligation to pay rent to Demor. For the years 1959 to 1962, he made only such payments of rent as were required to pay Demor's expenses. We are not convinced that the parties ever intended that the sums withdrawn from the purported Totten Trusts should be bona *43 fide loans. We hold that the claimed interest deductions are not allowable. [4]
Issue II: Deductibility of Rent Liability to Demor Sidney's rent liability to Demor was about $6,000 a year for the tax years before the Court. For the years 1953 through 1958, petitioner made payments to or on behalf of Demor in excess of his rent liability. In 1959, Sidney satisfied his liability primarily through cancellation of Demor's debt to him for the accumulated overpayments and through issuing to Demor an unsecured demand note without interest. For the taxable years 1960-1962, Sidney discharged over 90 percent of his *44 rent liabilities to Demor by similar demand notes. No amounts were paid on these notes during the tax years in question. From 1953 through 1957, Sidney deducted in his annual Federal income tax returns the amounts of rent liability which he paid. In 1958, although Sidney paid Demor his rent liability, he claimed no deduction in that year, but deducted in 1959 the rent liability for both 1958 and 1959. For the remaining years in question Sidney deducted his rent liability for each year, including the portion satisfied by demand notes, even though none of the notes was actually paid. Respondent maintains that Sidney was on the cash method of accounting as to rent expenses to Demor and that under the cash method he may not deduct rent expenses to the extent that such liabilities were satisfied by unsecured notes. Petitioner's position, on the other hand, is that he is on either the accrual system or a hybrid system, and that consequently his rent liability should be accrued and deducted when due. As a general rule, taxable income must be computed under the accounting method regularly used *45 by the taxpayer in keeping his books if it clearly reflects income. Sec. 446(a). If the method does not clearly reflect income, or if no method of accounting has been regularly used by the taxpayer, the Commissioner may prescribe one which does. Sec. 446(b). "Method of accounting" includes both the taxpayer's overall method of accounting and his accounting treatment of each item; such overall methods include the cash receipts and disbursements method, the accrual method, and combinations of such methods or a hybrid method. Sec. 1.446-1(a)(1), Income Tax Regs. However, the regulations clearly contemplate consistency in the reporting of individual items. Sidney admits that he used the cash 1503 method for reporting rental expenses to the Pasternack Estate on the original building occupied by the Knitwear Shoppe. We find nothing in the regulations permitting him to use the cash method for reporting his rent for one portion of the building and the accrual method for the other. Since he used the cash method for all items except inventory purchases, he must also use that method for the rent to Demor. There is no merit in his alternative position that issuance *46 of the unsecured, demand notes, in any event, constituted payment. See Eckert v. Burnet, 283 U.S. 140 (1931); Baltimore Dairy Lunch, Inc. v. United States, 231 F. 2d 870 (C.A. 8, 1956). We think respondent was clearly correct in limiting Sidney's deductions for rent to Demor to the payments actually made. See sec. 461. Issue III: Proper Year to Report Use and Occupancy Insurance Proceeds We agree with respondent that the $29,025 of business interruption insurance proceeds was taxable to Sidney in 1959, the year in which it was received, not in 1957 and 1958 when the business interruption occurred. We have pointed out that Sidney was on the cash basis as to all items except inventory purchases. Accordingly, the business interruption insurance was also reportable on the cash basis. We think petitioner correctly reported the item as 1959 income. Even if we assume that Sidney was on the accrual method of accounting for this item, as he contends, the answer must be the same. We are aware that the courts have held that business interruption insurance proceeds accrue *47 when the right to receive them is established and the amount to be received can be fixed with reasonable accuracy. See Cappel House Furnishing Company v. United States, 244 F. 2d 525 (C.A. 6, 1957); Rite-Way Products, Inc., 12 T.C. 475 (1949); Sec. 1.451-1(a), Income Tax Regs. But the record shows that neither the fact nor the amount of the insurer's liability had been fixed prior to 1959. Indeed, during the year 1959, on February 5, petitioner instituted suit to collect his claim which was subsequently settled. In view of that suit and in the absence of substantial evidence to the contrary, we must find that a bona fide dispute existed as to Sidney's claim on January 1, 1959 - that the insurer denied liability, and that the amount of the liability was not established or subject to computation with reasonable accuracy. The law is, of course, settled that, where there is a dispute as to a taxpayer's right to receive income, under the accrual method of accounting the income is not taxable until a settlement is reached or a final judgment *48 rendered. See E. T. Slider, Inc., 5 T.C. 263 (1945); cf. Boston Elevated Railway Co., 16 T.C. 1084, 1106, 1107 (1951), affd. 196 F. 2d 923 (C.A. 1, 1952). Issue IV: Deductibility of Expenses of Home Office Sidney and Lila maintained office equipment and records for the Knitwear Shoppe in two rooms of their personal residence in which they performed certain duties after store hours. They also had an office at the store. Respondent says that petitioners have failed to prove that it was necessary for them to incur "home office expenses," or that they regularly used a portion of their personal residence for business purposes to which a pro rata portion of the expense of maintaining the residence may properly be attributed. Petitioners argue that they have regularly used the equivalent of one room of their eight-room residence for business purposes. Both parties rely heavily on Rev. Rul. 62-180, 1962-2 C.B. 52, which sets forth guidelines for determining the amount of deductions to which an individual is entitled if required to *49 use a portion of his residence in the performance of his duties as an employee. This reliance is to a degree unwarranted since petitioner Sidney Gollobin was obviously not an employee and it is not clear that Lila had such a status within the ruling. Therefore, the necessity of the Gollobins' business use of their home cannot be couched in terms of "condition of employment" or "voluntary use." We are convinced, however, that it was necessary for petitioners, and in particular for Lila, to use a portion of their residence as an office due to the lack of space for Lila at the Knitwear Shoppe office, and to store business records in the filing cabinets kept in their home. However, the business use extended to only two rooms, a den and a bedroom, and these two rooms were not exclusively so used. The filing cabinets were devoted solely to business use. The two desks, 1504 however, contained material other than that of the store, and other areas of the rooms were used for family purposes. On the basis of the record as a whole, we conclude that the portion of the house used and the extent of use is equivalent to one-half of one of the eight rooms. Cohan v. Commissioner, 39 F. 2d 540 *50 (C.A. 2, 1930). Therefore, one-sixteenth ($100) of the annual cost ($1,600) of maintaining and operating petitioners' residence is allocable to business use and is deductible. Issue V: Addition to Taxable Income of Withdrawals of Merchandise Petitioner Lila Gollobin withdrew from the Knitwear Shoppe merchandise costing at least $150 per annum during each of the taxable years in question. Respondent supports his addition of $150 to taxable income each year with two arguments: That Lila was a co-owner and as such cannot include merchandise withdrawn for her personal use in the cost of goods sold by petitioners' business, or, in the alternative, that if the merchandise so withdrawn was properly included in purchases of merchandise, then receipt of the goods by Lila constituted income to her. Petitioners maintain that the clothing was worn by Lila for advertising purposes, that with respect to the allowance Lila was treated like other full-time employees, and thus petitioners were not required to include the allowance in income. We agree with respondent that $150, the cost of the merchandise withdrawn by Lila Gollobin, must be added to petitioners' taxable income each year. Careful *51 consideration of the entire record does not convince us that the clothing was taken from the store and worn by Lila for advertising purposes. Her main duties were to do the buying of inventory merchandise and to serve as general manager. Thus, her main duties did not involve customer contacts. We think the clothing was withdrawn primarily to meet her personal needs even though its use may have provided some incidental advertising benefit. If Lila is a co-owner, then the general rule applies that a taxpayer may not include merchandise withdrawn for the use of himself or his family in computing the cost of goods sold in his business. P. P. Sweeten, 3 B.T.A. 37 (1925); accord, Fellipo Dicenso, 11 B.T.A. 620 (1928). Thus, under petitioners' method of inventory accounting the cost of these withdrawals would have to be subtracted from total purchases or added to total sales. On the other hand, if Lila is an employee and the merchandise withdrawn was properly included in the *52 cost of goods sold, the receipt of such goods by her was an economic or financial benefit, attributable to her services as an employee even though her use of the clothing may have provided some incidental advertising advantage. Hence, the value of such clothing would be includable in her gross income under section 61(a) as compensation. Cf. United States v. Wood-all, 255 F. 2d 370 (C.A. 10, 1958). Under one of these theories or the other, the cost of the merchandise withdrawn by Lila Gollobin from the Knitwear Shoppe must be included in petitioners' taxable income. Issue VI: Deductibility of Compensation Paid for Care of Petitioners' Chlidren as Medical Expense During the taxable years 1959, 1960, and 1961, petitioners claimed $3,245, $3,270, and $2,297, respectively, as medical expense deductions under section 213 for expenditures incurred as compensation to Niobi Giannitrapani who took care of their children during these years. The record shows that both prior to and during the years in question the health of the children was below normal. Niobi provided nursemaid and caretaker services to the children as well as medical services. In addition, she performed some *53 services directly for petitioners, who were both employed full time. Respondent disallowed the wages paid as a medical expense to the extent they exceeded $250 per year. He asserts that the remainder of the wages was paid so that petitioners could continue their fulltime work at the Knitwear Shoppe, and constitutes, therefore, a nondeductible personal expense. In contesting respondent's determination, petitioners concede that 20 percent of the wages paid in each of the taxable years in issue constitutes a personal expense, but they argue that the remaining 80 percent is a deductible medical expense because the illnesses of the children, in particular asthma and food allergies, demanded the attention of a practical nurse which their mother could not have provided even had 1505 she not been working. These positions of the parties pose the issue we must decide here. Section 262 states that "[except] as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses." The regulations under this section give as an example of a nondeductible *54 personal expense the cost of maintaining a household, including amounts paid for domestic service. Sec. 1.262-1(b)(3), Income Tax Regs. More specifically, the rule is well established that the cost of hiring a nursemaid or practical nurse to render general care to children so that the parents may work is a nondeductible personal expense. George B. Wendell, 12 T.C. 161 (1949) (not deductible as medical expense); cf. Mildred A. O'Connor, 6 T.C. 323 (1946) (not deductible as business expense). However, medical care is a personal expense for which the tax statute does expressly allow a deduction. [5] Medical care is defined as amounts paid "for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body, * * *." Sec. 213(e)(1)(A). In addition, section 1.213-1(e)(1)(ii) of the Income Tax Regulations further states that "[deductions] for expenditures for medical care allowable under section 213 will be confined strictly to expenses incurred primarily for the prevention or alleviation of a physical or mental defect or illness" *55 but an expenditure "which is merely beneficial to the general health of an individual" is not deemed expended for medical care. After taking into account the facts that Niobi continued working two months a year while the children were at summer camp, that the children made their own decisions as to diet and health precautions while at camp, that she performed extensive general housework for petitioners, that she rendered in addition to any special medical care to the children, substantial cleaning, food preparation, and supervision normally required in general care of children - all non-medical personal expenses which are nondeductible - we are satisfied that petitioners have not shown that respondent's determination of the amounts of Niobi's wages properly allocable to expenditures for *56 medical care is unreasonable. Decisions will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. The additions to tax under sec. 6651(a)↩ have been conceded by petitioner to the extent of the deficiencies determined herein.
2. SEC. 163. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩
3. The deficiency notice in Docket No. 7003-65 explained that an adjustment was made to "disallow accrued interest expense on alleged loan inasmuch as there has been no showing that a true indebtedness was intended and created." In view of this explanation and the absence of any evidence as to whether petitioners' children in their 1960-1963 returns reported the unpaid interest as having accrued, we do not consider whether the claimed deductions are disallowed by Code section 267.↩
4. In view of this conclusion we need not decide whether Sidney's withdrawals of funds deposited in the bank accounts as a matter of law effectuated pro tanto revocations of the Totten Trusts so that the loans, as a matter of law, were made by him and the deductions of unpaid interest are barred by Code section 267. See N.J. Stat. 17:9A-216; cf. Willard v. Willard, 103 Misc. 544, 170 N.Y.S. 886 (1918); Annotation, Manner and Sufficiency of Revocation of Tentative ("Totten") Trust of Savings, Bank Account, 38 A.L.R. 2d 1243, 1248-1249↩ (1954).
5. SEC. 213. MEDICAL, DENTAL, ETC., EXPENSES. (a) Allowance of Deduction. - There shall be allowed as a deduction the expenses paid during the taxable year, not compensated for by insurance or otherwise, for medical care of the taxpayer, his spouse, or a dependent (as defined in section 152↩) - * * *